**Susan Gloger MONCRIEF and Peter L. Gloger, Independent Co-executors of the Estate of Leroy J. Gloger and Reba K. Gloger, Plaintiffs-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 82–2209.

United States Court of Appeals, Fifth Circuit.

April 20, 1984.

---

Chamberlain, Hrdlicka, White, Johnson & Williams, Bruce Locke, Shelly Cashion, Houston, Tex., for plaintiffs-appellants.

James R. Gough, Asst. U.S. Atty., Houston, Tex., Richard Farber, Atty., Stanley S. Shaw, Jr., Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Tax. Div. Dept. of Justice, Washington, D.C., for defendant-appellee.

Before CLARK, Chief Judge, BROWN and HIGGINBOTHAM, Circuit Judges.

CLARK, Chief Judge:

The taxpayers appeal the trial court's grant of a judgment notwithstanding the verdict. The appellate issue turns on whether the tax attributes associated with operations of certain commercial real estate properly accrued to the corporation that held legal title, as the Commissioner contended, or whether those tax attributes properly accrued to a partnership, as the taxpayers contended and the jury found, because the corporation held the property merely as the agent or nominee of the partnership. Finding the evidence sufficient to support the jury's verdict, we reverse and remand with instructions to reinstate the verdict.

## I

In 1972, Richard B. Merrill, Jr., and Harold Chamberlain formed Texas Professional Tower Ltd., a limited partnership. Merrill was sole general partner and Chamberlain sole limited partner. They each held a fifty percent ownership interest. The partnership owned an office building in Houston, Texas, named the Texas Professional Tower.

Merrill and Chamberlain needed cash to complete renovations in the Texas Professional Tower. Mutual business acquaintances put them in touch with Leroy J. Gloger, a Houston businessman who was in the process of arranging the sale of Houston radio station KIKK, which he owned. Chamberlain and Merrill testified that they met with Gloger on January 12, 1973, in Chamberlain's law offices. The testimony indicated that Merrill, Chamberlain, and Gloger "cut a deal" that day to form a new partnership. Merrill and Chamberlain were to contribute their respective interests in the Texas Professional Tower, plus another piece of real estate. Gloger, in turn, was to fund the partnership with proceeds from the sale of his radio station. Chamberlain testified that Gloger agreed to contribute sufficient proceeds to cover two mortgages on the real estate totalling $412,500, and to pay all the partnership's operating expenses from January 12, 1973, until the date the cash was contributed. Under the agreement, Merrill and Chamberlain were each to have a 25 percent ownership interest in the partnership, and Gloger was to have a fifty percent ownership interest.

The parties made no written agreement at the time of this meeting. Chamberlain testified that they agreed to remain general partners under their oral agreement until Gloger made his cash contribution, at which time Gloger would become a limited partner.

Chamberlain testified that the Texas Professional Tower limited partnership continued to hold legal title to the Texas Professional Tower, because they anticipated that Gloger would shortly make his cash contribution and that all paperwork would be done at that time.

Gloger was slow in making his cash contribution. It was decided that the partnership needed immediate financing. On April 19, 1973, Merrill and Chamberlain deeded their interests in the Texas Professional Tower to Merrill's wholly-owned corporation, the 608 Corporation.[1] The testimony indicated that Gloger did not participate in this decision.

Merrill had established the 608 Corporation in 1971. He testified that he created it for the purpose of borrowing funds necessary to conduct the partnership's business. The corporation was able to acquire financing more readily than the partnership or an individual, because Texas usury laws at the time permitted lenders to charge corporate borrowers substantially higher rates of interest than individuals or partnerships. He testified that the "corporation was just me.... It was strictly my ... front for me to be able to borrow money."

On May 14, 1973, the 608 Corporation borrowed $200,000. On June 1, 1973, the 608 Corporation conveyed title to the building back to Texas Professional Tower, Ltd. Merrill testified that he assumed he used the $200,000 to pay off a previous mortgage.

On July 9, 1973, Gloger made his agreed-upon contribution, which then totalled $527,000. At that time, an agreement was executed forming Houston Downtown Properties, Ltd., a limited partnership, to conduct a real estate business which included the Texas Professional Tower. The agreement stated that it was "entered into as of January 12, 1973." Chamberlain testified that this provision was intended to "reflect that this agreement of limited part-

---

**1.** In 1972, prior to reaching the alleged agreement with Gloger, Merrill and Chamberlain had already transferred to the 608 Corporation a one-half undivided interest in the Texas Profes- sional Tower. The April 19 transfer thus gave the 608 Corporation full legal title to the building. Both transfers were without consideration.

nership encompassed an agreement that was made on January the 12th, 1973 ...," but that the limited partnership was not intended to replace the oral general partnership agreement until the date the agreement was executed.

On their 1973 joint tax return, Gloger and his wife claimed $342,170 in deductions arising from activities of the Houston Downtown Properties partnership for calendar year 1973. The Commissioner disallowed $49,497 of these deductions attributable to the interest in the Texas Professional Tower held by the 608 Corporation prior to June 1, 1973. The Commissioner determined that losses arising while the 608 Corporation held legal title to the Texas Professional Tower were properly attributable to the corporation, and not to the partnership or to the individual partners. Moreover, the Commissioner contended that Gloger did not become a partner until the limited partnership agreement was executed on July 9, 1973.

The taxpayers[2] paid the assessed deficiency and, following denial of their refund claim, instituted this lawsuit. At trial, the taxpayers argued that the 608 Corporation was the true agent or nominee of the partnership and that the partnership was entitled to the tax losses associated with all 1973 operations of the Texas Professional Tower. In response to two special interrogatories,[3] the jury found that (1) Gloger had entered into "a partnership" with Merrill and Chamberlain on January 12, 1973, and (2) the 608 Corporation was acting as the partnership's agent until June 1, 1973. The trial court granted the government's motion for judgment n.o.v. on the grounds that the taxpayers had not sustained their burden of proof that an agency relationship existed. The trial court found, however, that there was "substantial evidence from which a jury might infer that Mr. Gloger entered into a valid and enforceable oral partnership agreement, resulting in a general partnership, on January 12, 1973."

The taxpayers appeal. The Commissioner does not contest the finding that Gloger was a member of the partnership as of January 12, 1973.

## II

We recently restated our long-standing rules concerning judgments n.o.v. Confirming the standard set in *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc), we said:

Under the standard established in *Boeing*, a motion for directed verdict or for judgment n.o.v. should be granted only when the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict. The court should consider all of the evidence—not just that evidence which supports the nonmovant's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fairminded persons in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. A motion for directed verdict or judgment n.o.v. should not be decided by which side has the better case, nor should the motion be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in

---

**2.** Leroy Gloger died during the pendency of this action. The co-executors of his estate, Susan Gloger Moncrief and Peter L. Gloger, were substituted as parties.

**3.** The full text of these special interrogatories was as follows:

Do you find from a preponderance of the credible evidence that Mr. Gloger entered into a partnership on January 12, 1973 with Mr. Harold A. Chamberlain and Mr. Richard B. Merrill?

Do you find from a preponderance of the credible evidence that the 608 Corporation was acting as the agent of Houston Downtown Properties from January 12, 1973 through June 1, 1973?

substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of fact, and not the court, to weigh conflicting evidence and inferences, and to determine the credibility of witnesses. *Maxey v. Freightliner Corp.*, 665 F.2d 1367, 1371 (5th Cir.1982) (en banc). We proceed under that test.

In the past, taxpayers have sought under two distinct theories to claim individually tax attributes of property held by corporations. Under one theory, it has been argued that the corporate entity should be disregarded, because it has no tax identity distinct from its shareholders. Under the other theory, it has been argued that the corporation, although a separate entity, has acted only as the nominee or agent with respect to the specific property in issue, wherefore the property's tax attributes should accrue to the principal. *See* Miller, The Nominee Conundrum: The Live Dummy Is Dead But the Dead Dummy Should Live, 34 Tax L.R. 213, 221–22 (1978).

The "disregard" theory has met with little success in the courts. In *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943), the Supreme Court considered and rejected such an argument advanced by an individual who had transferred property to a wholly-owned corporation at the insistence of his mortgagee. The Court stated:

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.

*Id.* at 438–39, 63 S.Ct. at 1133–34 (footnotes omitted). *Accord Evans v. Commissioner of Internal Revenue,* 557 F.2d 1095 (5th Cir.1977); *Collins v. United States,* 514 F.2d 1282 (5th Cir.1975), *aff'g per curiam,* 386 F.Supp. 17 (S.D.Ga.1974).

The taxpayers concede that the 608 Corporation should not be disregarded as a separate legal entity for tax purposes. Rather, they argue that the 608 Corporation acted only as the agent or nominee of the partnership with respect to the Texas Professional Tower.

In *National Carbide Corp. v. Commissioner,* 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949), the Supreme Court established criteria for determining a true agency or nominee relationship for tax purposes. In that case, Airco established several wholly-owned subsidiaries to conduct all its business. Contracts provided that the subsidiaries were employed as Airco's agents. Airco was to supply its subsidiaries with working capital, management services, and office facilities. The subsidiaries were to manufacture and sell products, and turn over profits to Airco.

The subsidiaries argued that their income should be taxed directly to Airco, because they were acting only as Airco's agents. Because the Court in *Moline* cited *Southern Pacific Co. v. Lowe,* 247 U.S. 330, 38 S.Ct. 540, 62 L.Ed. 1142 (1918), in support of its statement that the rule that a corporation is a separate taxable entity had recognized exceptions, 319 U.S. at 439, they argued that *Southern Pacific* defined the content of agency for tax purposes. The taxpayers argued that in a parent/subsidiary context, "practical identity" established, *ipso facto*, an agency relationship.

The *National Carbide* Court rejected this argument as a misinterpretation of *Southern Pacific,* which was not predicated on any theory of agency. Rather, they said, *Southern Pacific* held that the corporate entity might be ignored for tax purposes because of the "practical identity" of the parent and subsidiary corporation. The Court further pointed out that *Moline* had repudiated *Southern Pacific,* and that, in any event, it was inapplicable to the taxpayers' agency argument.

Complete ownership of the corporation, and the control primarily dependent upon such ownership—the important ingredients of the Southern Pacific case—are no longer of significance in determining taxability. *Moline Properties, Inc. v. Commissioner,* supra; *Burnet v. Commonwealth Improvement Co.,* 1932, 287 U.S. 415, 53 S.Ct. 198, 77 L.Ed. 399.

336 U.S. at 429, 69 S.Ct. at 730.

*National Carbide* held that the Tax Court had improperly failed to distinguish "agency" and "practical identity" when it ruled the subsidiaries were true agents.

The theory upon which the Tax Court expunged the deficiencies apparently was ... that the corporate entity may be disregarded (or the corporation treated as an agent of its owner) for tax purposes when the facts of ownership and control of the corporation approximate those presented by the *Southern Pacific* case.

*Id.* at 431, 69 S.Ct. at 731. Hence, in finding that the subsidiaries were Airco's agents, the Tax Court improperly relied only on the facts of ownership, control, and right to income. *Id.* at 433, 69 S.Ct. at 732. The Supreme Court agreed with the court of appeals that the *Southern Pacific* indicia of practical identity "can make no difference tax-wise." *Id.* at 432, 69 S.Ct. at 731. Although the fact of ownership does not negate the existence of an agency relationship, neither does it establish such a relationship. *National Carbide* indicated something more was needed:

What we have said does not foreclose a true corporate agent or trustee from handling the property and income of its owner-principal without being taxable therefor. Whether the corporation operates in the name and for the account of the principal, binds the principal, by its actions, transmits money received to the principal, and whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. If the

corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case. Its business purpose must be the carrying on of the normal duties of an agent.

*Id.* at 437, 69 S.Ct. at 734.

When *National Carbide* is set in its proper decisional context, it becomes clear that the Court sought to illustrate indicia of a true agency relationship. It is equally clear that the Court sought to rebut the taxpayers' erroneous reliance on the *Southern Pacific* indicia of "practical identity" and reiterated its previous recognition that this consideration "made no difference tax-wise." *Id.* at 432, 69 S.Ct. at 731.

In *Roccaforte v. Commissioner,* 708 F.2d 986 (5th Cir.1983), this court quoted the above passage from *National Carbide* and enumerated with bracket insertion six distinct factors thus:

What we have said does not foreclose a true corporate agent or trustee from handling the property and income of its owner-principal without being taxable therefor. [1] Whether the corporation operates in the name and for the account of the principal, [2] binds the principal, by its actions, [3] transmits money received to the principal, and [4] whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. [5] *If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case.* [6] Its business purpose must be the carrying on of the normal duties of an agent.

708 F.2d at 990, *quoting and adding emphasis,* 69 S.Ct. at 734.

The *Roccaforte* court also explained:

The first four conditions set out in *National Carbide* are general principles of agency law, and serve only as "relevant considerations" in the determination

of true agency status. The fifth and sixth conditions, however, are mandatory and absolute. The plain language of *National Carbide* admits of no other interpretation. The fifth condition states that in order. to be a true agent, a corporation's "relations with its principal must not be dependent upon the fact that it is owned by the principal." The sixth condition is framed in equally mandatory language. The fifth and sixth conditions are not mere factors of uncertain weight; they are prerequisites which must be satisfied before a corporation can qualify as a true agent.

*Id.* at 989. *Cf. Jones v. Commissioner,* 640 F.2d 745, 755 (5th Cir.1981) (referring to "the crucial fifth and sixth *National Carbide* factors—whether the relationship was arms-length and independent, and whether the corporate general partner functioned in a manner consistent with the normal duties of a general partner ...."), *cert. denied,* 454 U.S. 965, 102 S.Ct. 507, 70 L.Ed.2d 381 (1981).

■ This circuit forbids this panel to assess the correctness of *Roccaforte*'s construction of *National Carbide* as setting forth six "conditions" or "factors." Therefore, the panel must determine in light of all six "factors" whether there was sufficient evidence to support the jury's finding that the 608 Corporation was the partnership's agent.

■ "Factor" [1] is whether the corporation operates in the name and for the account of the principal. Merrill testified that the lenders required "us to form corporations so we wouldn't be borrowing money and affecting the usury laws." He testified that the lenders required his personal guarantee on the loan and that when the property was later foreclosed, they sued him personally "because they didn't care about the corporation. They lent the money to me, and they sued me." The representation was made to the lender in a deed of trust that the 608 Corporation was acting for its own account and benefit and not as a trustee or agent of any non-corporate party. Merrill testified that this was a

lie, and that every corporate note executed in Houston contained such a boilerplate paragraph. In granting judgment n.o.v., the district court noted that there was evidence both ways on this issue, but that "[o]n balance, the first factor weighs in the United States' favor." Under *Maxey,* this was an inappropriate standard of review. Viewed with all reasonable inferences most favorable to the taxpayers, the facts and inferences do not point so strongly and overwhelmingly in favor of the Commissioner that reasonable persons could not have concluded that the 608 Corporation acted in the name and account of the partnership.

"Factor" [2] is whether the corporation binds the principal. As indicated above, Merrill testified that he guaranteed the loan. The limited partnership agreement states that Merrill and Chamberlain contributed their interests in the Texas Professional Tower subject to the indebtedness evidenced by the promissory note executed by the 608 Corporation on May 14, 1973. There was no evidence that any party other than the partnership ever made payments on the debt. Under *Maxey,* the jurors reasonably could have concluded that the 608 Corporation had bound the partnership by its actions.

"Factor" [3] is whether the corporation transmits money received to the principal. Although the jury had been instructed to consider this factor, in granting judgment n.o.v. the district court concluded that "[t]his factor is not applicable to the instant case since a corporate agent which is losing money would not be expected to transmit funds to its principal." The taxpayers contend that the corporation's transmittal of the loan proceeds to the partnership satisfies this criterion. Under either view, this factor does not negate the existence of an agency relationship.

"Factor" [4] is whether receipt of the income is attributable to the principal's employees' services or to the principal's assets. The trial court found that the evidence was sufficient to support the jury's finding with respect to this issue. We

agree that the jury had sufficient evidence to conclude that substantive ownership of the Texas Professional Tower remained with the partnership, although legal title vested temporarily in the corporation.

Over the government's objection, the trial court refused to instruct the jury specifically regarding "factors" [5] and [6].[4] Nevertheless, in granting judgment n.o.v., the district court considered these two "factors" and concluded that the taxpayers had failed to sustain their burden of proof. Because under *Roccaforte* these two "factors" are the only mandatory and absolute "factors," it was error for the district court to refuse to instruct the jury as to these two "factors" and then grant judgment n.o.v. on the basis of its own findings on those fact issues. Because we find no evidence in the record to support a conclusion that either of these "factors" was unsatisfied, however, it is pointless to remand for retrial.

"Factor" [5] described by *Roccaforte* rests upon the statement in *National Carbide* that "[i]f the corporation is a true agent, its relations with its principals must not be dependent upon the fact that it is owned by the principal, if such is the case." 69 S.Ct. at 734. In *Roccaforte*, all "factors" except [5] were found in the taxpayers' favor, yet the court determined that the failure to satisfy "factor" [5] precluded an agency relationship. *Roccaforte* thus establishes this criterion as the *sine qua non* of a true agency relationship.

There is a tension between this absolute and mandatory "factor" [5] and *National Carbide*'s explicit statement: "What we have said does not foreclose a true corporate agent or trustee from handling the property and income of its owner-principal without being taxable therefor." 69 S.Ct. at 734. That tension need not be resolved today, however, for in this case it is clear that the purported principal, the partnership, was in fact not the owner of the purported corporate agent.[5]

4. At the time of the trial of the instant case, *Roccaforte* was still pending on appeal. Hence the trial court did not have the benefit of *Roccaforte*'s interpretation of *National Carbide*.

5. Subsequent to this court's reversal of the Tax Court's decision in *Roccaforte*, the Tax Court had occasion to reconsider its analysis of the *National Carbide* fifth factor. In *Ourisman v. Commissioner*, slip op. at 24–26 (82 T.C. No. 15, Jan. 26, 1984), the Tax Court stated:

We have carefully re-examined our position in light of the views expressed by the Fifth Circuit, but with due respect to that court, we are not convinced that our position should be changed. Since venue for appeal of the present case is to either the Fourth Circuit or the District of Columbia Circuit, we are not required to follow the Fifth Circuit's decision in *Roccaforte*. *Golsen v. Commissioner* [Dec. 30,049], 54 T.C. 742 (1970), affd. [71–2 USTC ¶ 9497] 445 F.2d 985 (10th Cir.1971).

We disagree with the Fifth Circuit's interpretation of *National Carbide* as applied to the facts of *Roccaforte*. The Supreme Court did not intend to create a "factor checklist" to be mechanically applied to the facts of each case, and we do not believe that the "fifth factor" is "mandatory and absolute." 708 F.2d at 989. The one crucial question under *National Carbide* concerns the essential nature of the relationship between the purported corporate agent and its shareholders. *Raphan v. United States*, supra [3 Cl.Ct. 457 (1983)]. The Su-

preme Court expressly recognized that a corporation could act as an agent for its owners under certain circumstances (336 U.S. at 437, 69 S.Ct. at 734) and specified the indicia of a true agency relationship. There is no indication that the Court intended to deny a corporation the status of agent for its shareholders in spite of the presence of the indicia of agency (factors one through four) merely because the agency is to some extent based upon the shareholders' control of the corporation (factor five). Yet, in every case, the shareholders can control their corporation, and the adoption of the view of the Fifth Circuit would appear to lead to the conclusion that the corporation could not constitute the agent of its shareholders, despite other indicia of an agency relationship. When the Supreme Court stated that the corporation's relations with its principal "must not be dependent upon the fact that it is owned by the principal" (336 U.S. at 437, 69 S.Ct. at 734), the Court was merely reiterating its holding in *Moline Properties* that any such agency must be proved by "evidence other than the control which shareholders automatically possess over their corporations." B. Bittker and J. Eustice, [Federal Income Taxation of Corporations and Shareholders, par. 2–10 at p. 2–28 (4th ed. 1979)]. In other words, the taxpayer must prove that the agency existed independently of the shareholders' ownership and control. In the present case, the petitioners have sustained such burden.

In *Roccaforte,* the general and limited partners of a limited partnership transferred to a newly created corporation bare legal title to commercial real estate. The purpose of this transfer was to circumvent state usury laws: state law permitted only corporations, not individuals or partnerships, to obtain mortgage loans at the prevailing interest rates. The corporation executed an "agency" agreement disclaiming any beneficial interest in the real estate and agreeing to engage in business activities only as directed by the partners. The partners agreed to assume all corporate debts and to hold the corporation harmless from any liabilities arising from the real-estate project. The corporation took legal title to the real estate and borrowed the funds necessary for its development.

On its face, *Roccaforte* bears strong similarity to the case at bar. It is with respect to the crucial "factor" [5] that the two cases differ. In *Roccaforte,* stock was issued to all partners "in exactly the same percentages as their partnership interests." 708 F.2d at 987. In the case at bar, on the other hand, the 608 Corporation stock was held entirely by Merrill, who was only a twenty-five percent partner.

*Roccaforte* does not make clear the exact extent to which ownership in the purported principal partnership and the corporate agent must coincide before it can be said that the partnership owns and controls the corporation. It is apparent that *Roccaforte* would not require total coincidence of ownership. In *Roccaforte,* the corporation was organized and the property was transferred in October, 1973. On December 31, 1975, three new partners were brought into the partnership, receiving a combined partnership interest of ten percent but no corporate stock. 708 F.2d at 988. The court nevertheless determined that "the partners" owned and controlled the corporation. The court did not explain why the new 10% partners who held no stock were denied the benefit of an agency relationship with the corporation for the years 1975 and 1976. It is evident, however, that in *Roccaforte,* there was no question but that the partnership entity, by pro rata

ownership of all the corporate stock among all the partners, directly owned and controlled the corporation for over two years. When three new partners, with a ten percent aggregate interest, were admitted in the third year, the same parties continued to own a controlling interest in both entities. The partnership entity's ownership and control of the corporation was found to remain intact.

In *Raphan v. United States,* 3 Cl.Ct. 457 at 461–462 (1983), three brothers (the Pomponios group) conveyed commercial real estate to a partnership. A group of investors (the Tenzer group) contributed cash. The partnership transferred the real estate to the Pomponios' wholly-owned corporation to circumvent state usury laws. The court held that the corporation was the agent of the partnership, articulating "factor" [5] of *National Carbide* thus:

> The crucial inquiry under *National Carbide* is the nature of the relationship between the agent, JBC, and the principal, Associates. If the two entities are affiliated, the burden is on the taxpayer to show, in the words of *Roccaforte,* "that an agency relationship could exist independent of such ownership and control." 708 F.2d at 990. The two entities can be affiliated in one of two ways. First, the principal can own a controlling interest in the agent; that was the situation in *National Carbide.* See also *Moline Properties,* 319 U.S. at 437 [63 S.Ct. at 1133]; *Harrison Property Management Co.* [*v. U.S.*], 201 Ct.Cl. [77] at 80 [475 F.2d 623]. Second, the entities can be affiliated because the same parties own a controlling interest in both. See *Vaughn* [*v. U.S.*], No. 526–81T, slip op. at 2 [3 Cl.Ct. 316 at 317]; *Roccaforte,* 708 F.2d at 987; *Jones v. Commissioner,* 640 F.2d 745, 747–48 (5th Cir.), *cert. denied,* 454 U.S. 965 [102 S.Ct. 507, 70 L.Ed.2d 381] (1981); *Taylor v. Commissioner,* 445 F.2d 455, 456 (1st Cir.1971).

In *Raphan,* the court found that the partnership and corporation were not affiliated in either of these two ways. In ana-

lyzing the second mode of affiliation, the court looked behind the "paper" reality to ask whether the partners who held stock and those who did not were so closely aligned in interest that the nonstockholding partners could control the corporation through the stockholding partners. It found that they were not. *Id.* at 462. The court concluded, "The fact that principal and agent were not commonly controlled entities goes a long way toward allaying the concerns expressed in *National Carbide.*" *See also Carver v. United States,* 188 Ct.Cl. 202, 412 F.2d 233 (Ct.Cl.1969) (absence of mutual stock ownership by two partners led to "inescapable conclusion" that the corporation was necessarily acting as agent or trustee for nonstockholding partner and hence as agent or trustee of the partnership). *But see Stillman v. Commissioner,* 60 T.C. 897, 909 (1973) (existence of one-third interest partner without stock ownership in purported corporate agent did not foreclose the conclusion that the partnership's and corporation's affiliation was fatal to an agency relationship, where the nonstockholding partner was "at most a passive investor and guarantor").

In the case at bar, the partnership did not directly own stock in the 608 Corporation. The same parties did not own a controlling interest in both the partnership and the 608 Corporation. Nor is there any evidence that Merrill was so closely aligned in interest with Gloger and Chamberlain that they could exercise control over the 608 Corporation through Merrill. Chamberlain testified that he had no knowledge of the operations of the 608 Corporation. There is no evidence that Gloger even knew of the existence of the 608 Corporation. There is evidence that Gloger's relationship was established at arm's length. Merrill and Chamberlain had never done business with Gloger before the partnership was created. The parties dealt with each other at arm's length. Both Merrill and Chamberlain testified that Gloger did not contribute the proceeds of his radio station immediately upon the sale as agreed, but instead invested in certificates of deposit. Only after Merrill and Chamberlain learned of

the sale from other sources and exerted pressure on Gloger did he place the certificates in the partnership, some months after he had acquired them. There is no evidence of personal loyalties to indicate that Gloger could have influenced the 608 Corporation through Merrill.

The Commissioner argues that Merrill's special fiduciary duty as general partner of a limited partnership was sufficient to attribute ownership or control of his wholly-owned corporation to the partnership, so as to negate an agency relationship under *Roccaforte.* We disagree. Under the facts of this case, it is not apparent that the oral partnership that the jury found existed at the period of the transactions in question was in fact a limited partnership. The limited partnership agreement states that a person shall become a limited partner when he has, *inter alia,* contributed the capital required of him. Gloger contributed no capital until July 12, 1973. Chamberlain testified that, under the oral agreement, the partnership was to remain a general partnership until Gloger made his contribution.

Even assuming, *arguendo,* that Merrill was general partner of a limited partnership during the period in question, his fiduciary duty alone would not be sufficient to attribute his control of the 608 Corporation to the partnership so as to negate an agency relationship. Under Texas law, the duty that the general partner owes to limited partners is like that owed by a trustee to trust beneficiaries. *Crenshaw v. Swenson,* 611 S.W.2d 886, 890 (Tex.Civ.App.1981). A trustee is not necessarily subject to the control of beneficiaries in respect to property held for their benefit. If he is subjected to the beneficiaries' control, the trustee also becomes an agent. Restatement (Second) of Agency § 14B.

Nor do we subscribe to the argument that Merrill's powers of control over partnership property as general partner of a limited partnership, assuming *arguendo* that he were such a general partner, are *per se* synonymous with the partnership's,

so as to attribute ownership and control of the 608 Corporation to the partnership, for purposes of defining the affiliation that would invoke "factor" [5] under *Roccaforte.* Such an attribution ignores the limited partners' statutory rights in the partnership. *See* Tex.Civ.Code Ann. art. 6132a § 11.

*Roccaforte*'s "factor" [6] is whether the business purpose of the purported agent is the carrying on of the normal duties of an agent. The uncontroverted testimony in the instant case indicated that the sole purpose and activity of the 608 Corporation was to acquire financing for the partnership from lenders who wished to circumvent Texas usury laws. The record indicates no evidence that the business purpose of the corporation was inconsistent with the role of agent.

Nor do we perceive any cogent policy grounds advanced for denying the 608 Corporation agency status in this case. The sole policy consideration enunciated in *Roccaforte* was that the "separate entity regime would collapse" if the taxpayer could predicate an agency relationship on characteristics common to all closely-held corporations. 708 F.2d at 990. In this case, the taxpayers have conceded that the corporation was a separate entity. As *National Carbide* instructs, the concerns raised with respect to agency relationships are not the same as the concerns raised by arguments of "practical identity."

### III

At the end of the jury trial, the government made alternate motions for judgment n.o.v. and a new trial. The motion for a new trial was predicated on the trial court's refusal to instruct the jury on *Roccaforte*'s "factors" [5] and [6] and on the trial court's refusal to require the jury to determine whether Gloger's alleged oral partnership was a general or limited partnership. In granting the government's motion for judgment n.o.v., the trial court refused to consider further the motion for a new trial, but conditionally denied the motion pursuant to Fed.R.Civ.P. 50(c)(1).

The government argues that the district court committed reversible error under rule 50(c)(1) by conditionally denying the motion for a new trial without evidencing consideration of the merits of the motion.

■ Upon overturning a judgment n.o.v., the disposition of the appeal is a matter for the appellate court's discretion. *Kendrick v. Illinois Central Gulf Railroad Co.,* 669 F.2d 341, 343 (5th Cir.1982). We agree that the district court should have instructed the jury as to all the factors relevant to determining an agency relationship, but because the record indicates no basis upon which the jury could, as a matter of law, have reached a contrary conclusion with respect to the factors at issue, it would be pointless to remand for a new trial. Likewise, we have determined that it made no difference to the outcome of this case whether the partnership during the period at issue was a general or limited partnership.

For these reasons, we reverse and remand to the district court with instructions to reinstate the verdict.

**REVERSED and REMANDED.**