JESSE C. BOLLINGER, JR., ET AL., [1] Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent Bollinger v. Commissioner
Docket Nos. 5883-78, 5884-78, 5885-78, 5886-78, 5887-78, 17521-80, 5430-81, 5431-81, 5432-81.
United States Tax Court
T.C. Memo 1984-560; 1984 Tax Ct. Memo LEXIS 110; 48 T.C.M. (CCH) 1443; T.C.M. (RIA) 84560; October 18, 1984. *110 Chaarles R. Hembree and Philip E. Wilson, for the petitioners. Mark S. Feuer, for the respondent. WILES MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Docket
Taxable
Petitioner
No.
Year
Deficiency
Jesse C. Bollinger, Jr.
5883-78
1971
$59,989.91
1972
3,622.44
Edward H. Peter, Jr. and
Mary H. Peter
5884-78
1969
3,617.64
1970
25,227.36
1971
27,406.41
1972
3,576.37
1973
93,571.11
Paul W. Hensley and
Mary N. Hensley
5885-78
1967
1,833.82
1969
3,021.17
1970
3,653.99
1971
12,901.76
1972
5,545.05
1973
6,335.24
Jesse C. Bollinger, Jr., and
Suz-Anne Bollinger
5886-78
1973
103,712.86
Jesse C. Bollinger, Jr., and
Jacqueline Bollinger
5887-78
1969
32,986.91
1970
28,273.84
Jesse C. Bollinger, Jr., and
Suz-Anne Bollinger
17521-80
1976
110,823.25
Edward H. Peter, Jr., and
Mary H. Peter
5430-81
1976
35,161.66
1977
99,060.34
Jessee C. Bollinger, Jr., and
Suz-Anne C. Bollinger
5431-81
1977
84,553.74
Paul W. Hensley and
Mary N. Hensley
5432-81
1977
8,876.97
*111 After concessions by the parties, the sole issue for decision is whether the losses generated by the construction and operation of various apartment complexes are attributable to the partnerships which operated the paartment buildings or to the corporation which was created to act as an agent for the partnerships for certain limited purposes. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Jesse C. Bollinger, Jr. (hereinafter Bollinger), and Suz-Anne C. Bollinger, husband and wife, resided in Glenview, Kentucky, when they filed their petitions herein. Jesse C. and Suz-Anne C. Bollinger filed joint Federal income tax returns for their 1973, 1974, 1975, 1976, and 1977 taxable years with the Internal Revenue Service Center in Memphis, Tennessee. Petitioner Jacqueline Bollinger (Bollinger's former wife) resided in Louisville, Kentucky, when she filed her petition herein. Petitioners, Jesse C. and Jacqueline Bollinger, filed joint Federal income tax returns for 1969 and 1970 taxable years with the Internal Revenue Service Center in Memphis, Tennessee. Bollinger filed his individual Federal income tax returns for his 1971 *112 and 1972 taxable years with the Internal Revenue Service Center in Memphis, Tennessee. Petitioners, Edward H. Peter, Jr., (hereinafter Peter) and Mary H. Peter, resided in Louisville, Kentucky, when they filed their petitions herein. Edward H. and Mary H. Peter, filed joint Federal income tax returns for their 1969, 1970, 1971, 1972, 1973, 1974, and 1975 taxable years, and an amended tax return for their 1973 taxable year, with the Internal Revenue Service Center in Memphis, Tennessee. Petitioners, Paul W. Hensley (hereinafter Hensley) and Mary N. Hensley, husband and wife, resided in Lexington, Kentucky, when they filed their petitions herein. Paul W. and Mary N. Hensley, filed joint Federal income tax returns for their 1969, 1970, 1971, 1972, 1973, 1974, 1975, 1976, and 1977 taxable years with the Internal Revenue Service Center in Memphis, Tennessee. During the years in issue, Bollinger was engaged in the business of real estate development. Bollinger, either individually or in partnership with others, developed the following apartment complexes in the State of Kentucky: Creekside North Apartments; Carriage Hill Apartments; Creekside South Apartments; Les Chateaux *113 Apartments; Lamplighter Apartments; Two Lakes Apartments; Ski Lodge Apartments; and Cloister Apartments. In order to obtain construction financing for the various apartment complexes, financial institutions required that the nominal debtor be a corporate nominee of the partnership, [2] and accordingly, record title to the various properties was held by the corporate borrower. The following chart shows the apartment complex constructed, the partnership constructing the complex, the individual's interest in the partnership, and the corporate nominee holding title: Individual's Interest in the Partnership
Apartment Complex
Partnership
Bollinger
Peter
1. Creekside North *
*
100%
2. Carriage Hill
Carriage Hill
66-2/3%
3. Creekside South
Creekside South
50%
50%
4. Les Chateaux
Les Chateaux
33-1/3%
33-1/3%
5. Lamplighter
Lamplighter
33-1/3%
33-1/3%
6. Two Lakes
Two Lakes: 7/16/71-9/10/74
50%
9/10/74-2/6/75
2%
After 2/6/75
0
7. Ski Lodge *
*
100%
8. Cloister
Cloister
7/15/73-1/4/74
50%
1/4/74-11/5/75
9-1/2%
After 11/5/75
0
George
Samuel
Robert
Apartment Complex
Hensley
Martin
Zell
Laurie
Title
1. Creekside North *
Creekside, Inc.[1]
2. Carriage Hill
33-3/3%
Creekside, Inc.
3. Creekside South
Creekside, Inc.
4. Les Chateaux
33-1/3%
Creekside, Inc.
(Sold Sept. 1971)
5. Lamplighter
33-1/3%
Creekside, Inc.
6. Two Lakes
50%
Creekside, Inc.
98%
Howard Walker, Trustee
100%
Howard Walker, Trustee
7. Ski Lodge *
Creekside, Inc.
(Sold 1975)
8. Cloister
50%
Cloisters, Inc. [2]
(Until 12/31/74)
9-1/2%
81%
Greenland Vista, Inc. [3]
0
19%
(After 12/31/74)
*114 Sometime during 1968, Bollinger sought to construct an apartment complex on a portion of land owned at the time by Beacon Hill, Inc. In order to secure the construction loan and permanent financing for the proposed development of the Creekside North Apartments, Bollinger consulted with Mr. Bryan Sumner (hereinafter Sumner), a mortgage banker in Louisville, Kentucky. [3] Bollinger was advised that financing could be obtained for real estate development projects only through a "corporate nominee." During the years in issue, Kentucky law provided that a loan made to a noncorporate borrower at a rate exceeding 7 percent per annum was usurious. During such period, the prevailing local interest rate for construction financing was over 7 percent. In order to obtain the construction loan and permanent financing, the *115 financial institutions required that the nominal debtor be Bollinger's corporate nominee, and accordingly, record title to the property would be held by the corporate borrower. On July 24, 1968, Sumner obtained a loan commitment for permanent financing from Massachusetts Mutual Life Insurance Company (Massachusetts Mutual Life) in which Massachusetts Mutual Life agreed to loan "the corporate nominee of Jesse C. Bollinger, Jr.", $1,075,000 at an interest rate of 8 percent per annum. The loan was to be secured by a mortgage on Creekside North Apartments and by a personal guarantee of Bollinger. Bollinger, desirous to hold title in the apartment complex in his individual name, conferred with his accountant and his *116 attorney, whereupon he was advised that the use of corporate nominees in order to obtain construction financing was common practice in the State of Kentucky. On October 14, 1968, Bollinger incorporated Creekside, Inc., under the laws of the Commonwealth of Kentucky, for the sole purpose of having a nominee corporation to secure financing for the development of his apartment projects. At all relevant times Bollinger was the sole shareholder of Creekside, Inc.
On October 15, 1968, Bollinger and Creekside, Inc., entered into an agreement which generally provided that Creekside, Inc., would hold title to the Creekside Apartment Complex as Bollinger's agent only for the purpose of securing temporary and permanent financing of the project. [4]
*117 To finance construction of the Creekside North Apartments, Bollinger, through Creekside, Inc., borrowed the funds from Citizens Fidelity Bank and Trust Company (hereinafter Citizens Fidelity). Creekside, Inc., executed all necessary loan documents including the promissory note, mortgage, and deed. Upon receipt, Creekside, Inc., transferred all loan proceeds to Bollinger's individual construction account. Bollinger acted as general contractor during the construction of the Creekside North Apartments, and he employed Hensley on a fixed fee basis as construction supervisor. Hensley supervised the construction, ordered materials, scheduled the work and received, reviewed, and approved all invoices. After conferring with Bollinger about construction invoices submitted for payment, costs of the construction were paid by Hensley from the construction account. On completion of the Creekside North Apartments, Bollinger, through Creekside, Inc., obtained permanent financing from Massachusetts Mutual Life in accordance with its commitment letter of July 24, 1968. This loan was secured by a mortgage upon Creekside North Apartments and by a partial personal guarantee *118 executed by Bollinger. The loan proceeds received from Massachusetts Mutual Life were used to pay off the prior construction loan obtained from Citizens Fidelity. During all relevant times, Bollinger intended to retain all but record title to the property and apartment complex, and he intended that the corporation would convey record title to him as soon as conveyance became feasible. Bollinger always regarded himself as the real owner of the property. On November 8, 1979, Creekside, Inc., conveyed title to the property to Bollinger. After the Creekside North Apartments were completed, Bollinger employed Mr. John Thompson (hereinafter Thompson) as resident manager to rent the apartments, execute leases for apartment rental, collect and deposit the rent received, and maintain operating records. Thompson deposited all rental receipts into, and paid all operating expenses from, a separate operating account at Central Bank and Trust Company in Lexington, Kentucky. Although the operating account was first opened in the name of Creekside, Inc., it was changed during 1971 to "Creekside Apartments, a partnership." The operation of the Creekside North Apartments generated *119 losses in the amount of $41,071.17, $7,758.14, $3,416.76, $6,815.61, and $13,342.03, for the taxable years 1969, 1971, 1972, 1973, and 1974, respectively, and generated ordinary income in the amounts of $722.62, $25,805.62, $37,285.22, and $34,511.34, for the taxable years 1970, 1975, 1976, and 1977, respectively. The income and losses generated by Creekside North Apartments were reported by Bollinger on his individual income tax returns throughout the years in issue. Petitioners secured financing for the construction of Carriage Hill, Creekside South, Les Chateaux, Lamplighter, Two Lakes, Ski Lodge, and Cloister Apartments through the use of a corporate nominee. In each case, the pattern was substantially identical to the development of the Creekside North Apartments. For each of the respective apartment complexes the financial institution required that the construction loans and permanent financing be made to a corporate nominee with at least a partial personal guarantee by the partners; the partnerships executed nominee agreements, which were similar in all relevant respect to the agreement set forth in note 4, supra, with the corporation for the sole purpose of obtaining *120 the financing; and the corporation transferred the construction loan proceeds upon receipt to the partnership's construction accout from which all invoices were paid by the construction supervisor hired by the partnership. Upon completion of each of the respective apartment complexes, the corporate nominee secured permanent financing which was used to pay off the construction loan.Each partnership actively managed its respective apartment complex depositing all rental receipts into, and paying all expenses from, a separate partnership account. Income and losses generated by each of the apartment complexes, except Ski Lodge, were reported by the respective partnerships on U.S. Partnership returns (Form 1065) filed for the years in issue. Petitioners in turn reported their distributive share of the partnership income and losses on their individual income tax returns filed during the years in issue. Bollinger reported the income and losses generated by Ski Lodge Apartments, a sole proprietorship, on his individual income tax returns. At all relevant times, Bollinger, or the respective partnership, intended to retain all but record title to the apartment complexes. They *121 always regarded themselves as the real owners of the property. It was only because the financial institutions would not provide either a partnership or an individual a construction loan or permanent financing for development of the projects that record title to the property was held by a nominee corporation, either Creekside, Inc., or Cloisters, Inc. In fact, in all loan commitment letters except the one for Cloister Apartments, the financial institution required that the loan be made to the corporate nominee of Jesse C. Bollinger. Creekside, Inc., acted as corporate nominee for the Carriage Hill, Creekside South, Les Chateaux, Lamplighter, Two Lakes, and Ski Lodge Apartments. Cloisters, Inc., acted as the corporate nominee for Cloister Apartment partnership. In order to secure the financing, Creekside, Inc., or Cloisters, Inc., as an agent for the respective partnership pursuant to the nominee agreement, signed the loan agreements, mortgages, deeds, and promissory notes in order to obtain the needed financing. At all relevant times, the lenders regarded Bollinger, or the respective partnership, as the owners of the apartment complexes. Financial institutions required *122 partial personal guarantees from the partners and looked to them for repayment. During the years in issue, Creekside, Inc., and Cloisters, Inc., had no liabilities, assets, employees, or bank accounts; nor did they manage the apartment complexes once the buildings were placed into service. In the statutory notices of deficiency, respondent disallowed the partners' claimed loss deductions determining that the partnership was not entitled to deduct expenses incurred during the construction, leasing, and operating of the various apartment complexes.[5] Respondent determined that such losses were those of the corporation which held record title to the real estate, either Creekside, Inc., or Cloisters, Inc. OPINION The sole issue for decision is whether the losses incurred by the construction and operation of the apartment complexes are attributable *123 to the corporation or to the individual partners in the pertnership. Petitioner argues that the corporation acted solely as an agent of the partnership, holding record title to the properties and obtaining project financing on behalf of the partnership only because of local usury restrictions. Thus, petitioners conclude that the partnership, as the principal, is the entity which is responsible for the tax consequences of the construction project. On the other hand, respondent maintains that there is no agency relationship recognized for tax purposes between the corporation and the partnership and that the losses generated by the projects are properly attributable to the corporation. We have carefully considered the issue of whether a corporation will be treated as a nontaxable agent for a partnership in Roccaforte v. Commissioner,77 T.C. 263 (1981), =P0001*14 revd. 708 F. 2d 986 (5th Cir. 1983), and Ourisman v. Commissioner,82 T.C. 171 (1984), both Court Reviewed Opinions. In Roccaforte, the taxpayers formed a partnership to build and operate an apartment complex.As in the present case, in order to secure financing *124 for the projects, the lenders required that the nominal borrower be a corporation in order to aboid the state usury limitations. The partners formed a corporation and executed an agreement providing that the corporation was to act only as an agent for the partnership to obtain financing, that the partners remained the owners of the realty, and that the corporation would act only upon the authorization of the partners. The agreement further provided that the partners would hold the corporation harmless for all acts and debts related to the apartment complex. The corporation acquired record title to realty and executed the document necessary to obtain both the construction and the permanent loans. Several of the partners personally guaranteed the loans. The corporate creditors were all aware that the corporation represented the partnership.The corporation supervised the construction and maintained a checking account into which it deposited the loan advances and from which it made interest and progress payments. The corporation had no assets, liabilities, income, or expenses; nor did it manage the apartment complex once the building was placed in service. In Roccasorte, we decided *125 that in National Carbide Corporation v. Commissioner,336 U.S. 422, 437 (1949), the Supreme Court established the following six factors to be considered in determining whether a true corporate agency relationship exists: (1) whether the corporation operates in the name and for the account of the partnership; (2) whether the principal is bound by the corporate-agent's actions; (3) whether the corporate-agent transmitted the money received to the partnership; (4) whether receipt of income is attributable to the assets or employees of the partnership; (5) whether the corporate-agent's relationship with the partnership was dependent on the fact that it was owned and controlled by the partners; and (6) whether the corporation's activities were consistent with the normal duties of an agent. No one factor is mandatory and absolute. [6]
*126 In Ourisman we reiterated our position that a corporation may, under the proper facts and circumstances, be considered as a true agent of the partnership. In Ourisman, the partnership wished to construct an office building. As in the present case, the usury laws prevented financial institutions from loaning the money directly to the individuals or the partnership. In order to obtain the financing, the lender required that the nominal debtor be the corporate nominee of the partnership, and accordingly, record title to the leasehold was held by the corporate nominee. The corporation executed the loan agreements as well as the promissory note and the deed of trust. The partners personally guaranteed payment of the construction loan and the partners always regarded themselves as the real owners of the property. As in the present case, the corporation never opened a bank account, loan proceeds were transferred to the partnership, the partnership made all interest and principal payments on the notes, the partnership operated and maintained the buildings, and the partnership *127 reported the income and losses from the operation of the buildings. In Ourisman, applying the indicia of agency specified in National Carbide as we interpreted them in Roccaforte, we held that: [T]he present case compels the conclusion that the corporation acted as the partnership's agent in the construction and operation of the office building. The corporation acted in the name and for the account of the partnership. The corporation was created at the insistence of the construction lender, which required that the loan be made to the corporate nominee of the partnership. * * * The agreement with the partnership also provided that the corporation would acquire the leasehold, obtain the necessary financing, and erect an office building solely as the nominee of the partnership, which would remain the corporation's principal and the true owner of the leasehold and improvements. [Ourisman v. Commissioner,supra at 181, 182.] The present case is indistinguishable from Roccaforte and Ourisman, and the facts before us compel the same conclusion reached therein, that is, the partnerships, and not the corporations, were the owners *128 of the apartment complexes for Federal income tax purposes. Creekside, Inc. and Cloisters, Inc., operated in the name of, and for the account of, the partnerships it represented. For each apartment project, the corporations entered into a separate nominee agreement with the partnership. Pursuant to the agreement, the corporations were not authorized to act except at the direction of the partnership. Further, the corporations never represented themselves as anything more than an agent of the partnership. Most lenders also required the partners to personally guarantee a portion of the loans needed for various projects. This indicates that throughout the years in issue, Creekside, Inc., and Cloisters, Inc., were acting as an agent for the underlying partnership. Indeed, the banks and financial institutions were well aware that the corporations were merely a shell. In fact, the lenders would not have lent the money directly to the individuals or the partnership because of usury laws and made most of the loan commitments to the corporate nominee of Jesse C. Bollinger. The corporations also bound the partnerships by their actions. Project creditors were all well aware that the corporations *129 were acting for the partnership. The nominee agreements provided that the partnerships remain the real party in interest with respect to the projects. The partnerships agreed to indemnify and hold harmless the corporation for any liability it might sustain by reason of acting as an agent for the partnerships. The corporations were not obligated to care for or maintain the property. Finally, the partnership made all principal and interest payments on the loan and paid all other expenses associated with the apartment complexes. The third factor specified by the Supreme Court in National Carbide is whether the corporation transmitted receipts to the partnerships. The only funds which passed to the corporations were the construction and permanent loan advances which the corporation would immediately endorse and forward to the partnership.Rental receipts and expenses were collected by the partnership and deposited immediately in partnership accounts. The fourth factor is whether the income received from the apartment complexes was attributable to the employees and the assets of the partnerships. At no time throughout the years in issue did either Creekside, Inc., or *130 Cloisters, Inc., have any employees or hire any one to act on its behalf. Moreover, neither corporation had any assets beyond record title to the various apartment projects and, as soon as practical, the corporations conveyed title to the partnerships. At all relevant times, the partners believed themselves to be, and acted as, the owners of the apartment complexes. The partnerships hired the agents, performed the activities necessary to arrange for construction and operation of the apartment complexes, executed contracts, leases, andpaid the costs of constructing and operating the apartment complexes. The partners located the land and coordinated all the activities concerning construction of the apartment complexes.The corporation's only activity consisted of holding record title, executing the necessary loan documents, and endorsing loan advances to the partnerships. On this record we must conclude, as we did in Ourisman and Roccaforte, that the income realized from the buildings was attributable to the efforts and the assets of the partners. The fifth factor is whether the corporate-agent's relationship with the partners was dependent on the fact that it *131 was owned and controlled by the partners. In the instant case, Creekside, Inc., acted as an agent for seven partnerships: CreeksideNorth; Carriage Hill; Creekside South; Les Chateaux; Lamplighter; Two Lakes; and Ski Lodge. Although Bollinger owned 100 percent of the stock of Creekside, Inc., with the exception of the Creekside North Apartments and Ski Lodge Apartments, Bollinger did not have a 100 percent interest in all the partnerships. Bollinger had a 66 2/3 percent interest in the Carriage Hill partnership; a 50 percent interest in Creekside South and Two Lakes partnerships; and a 33 1/3 percent interest in Les Chateaux and Lamplighter partnerships. Thus, the facts before us are stronger than Roccaforte and Ourisman, where the corporations were controlled and dominated by the identical individuals whowere investors in the partnerships. [7] Although Creekside, Inc., was not compensated for the services it performed, because in at least five developments the partners did not own the stock of the corporation in the same percentage as their partnership interest, we believe that the agency relationship was not based upon the partners' ownership and control of both *132 entities. See Raphan v. United States,3 Cl. Ct. 457 (1983). With respect to Cloisters, Inc., in which the partners' ownership and control of both entities was in the same proportion, we must conclude that the corporate-agent's relationship with the partnership was dependent on the fact of common ownership and control. However, Cloisters, Inc., like Creekside, Inc., was acting as an agent for the partnership because it carried on only negligible activities, all persons dealing with it were aware it was acting as an agent, and the substantial activities involved in constructing and operating the building were performed by the partners. Since the corporations acted no differently than independent agents, they should be recognized for tax purposes as such. Ourisman v. Commissioner,supra at 187. See Raphan v. United States,supra at 463 ("Moreover, the narrow purpose of the agency agreement -- holding nominal title to avoid usury problems -- could have been performed equally well by a corporation unrelated to any of the *133 parties.") The final National Carbide factor is whether the corporation's activities were consistent with the normal duties of an agent. Both corporations, Creekside, Inc., and Cloisters, Inc., acted as an agent for the partnerships. The corporations executed a nominee agreement with each of the partnerships whereby Creekside, Inc. and Cloisters, Inc., agreed to hold title to the property for the sole purpose of obtaining financing for the construction of the apartments. Pursuant to that agreement the corporations executed the necessary documents to secure both temporary and permanent financing for the partnerships' projects. The lenders were all fully aware that the corporations were acting as an agent of the partnerships and merely holding legal title to the property in *134 order to satisfy the lenders' financing requirements. The corporations did not act in any manner which could be interpreted as an assertion of principalship. On this record we must conclude, as we did in Roccaforte and Ourisman, that petitioners have clearly established that the corporations were acting as the partnerships' agent in the construction and operation of the various apartment complexes. What we stated in Roccaforte is equally applicable herein: We are convinced that the investors desired to operate in partnership form and were forced to form a corporation to comply with the State's usury laws. The partners did not attempt to avail themselves of the normal benefits of the corporate form such as limited liability. Rather, the partners remained subject to the claims of creditors and to all other claims arising out of the apartment project. We believe that the entire substance of the arrangement was one of an agency relationship, and even the form (outside of the corporation's primary liability on the mortgages) indicated the agency relationship that was intended. We are not presented here with the use of a corporation as a tax-avoidance scheme. Rather, *135 the partners were forced to form a corporation in order to get financing for their project. They sought none of the traditional insulating benefits of a corporate shareholder. In substance, the partners were the true economic owners of the property with all the risks and benefits attendant thereto. In such cases, where the corporation was formed solely to satisfy the requirement of the bank in complying with State usury laws and the indicia of an agency relationship are present, we will respect the status of the corporation as an agent of the partnership. [77 T.C. at 278-288 (fn. ref. omitted), cited in Ourisman v. Commissioner,supra at 184.] To reflect the foregoing and concessions by the parties, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Edward H. Peter, Jr., and Mary H. Peter, docket No. 5884-78; Paul W. Hensley and Mary N. Hensley, docket No. 5885-78; Jesse C. Bollinger, Jr., and Suz-Anne Bollinger, docket No. 5886-78; Jesse C. Bollinger, Jr., and Jacqueline Bollinger, docket No. 5887-78; Jesse C. Bollinger, Jr., and Suz-Anne C. Bollinger, docket No. 17521-80; Edward H. Peter, Jr., and Mary H. Peter, docket No. 5430-81; Jesse C. Bollinger, Jr., and Suz-Anne C. Bollinger, docket No. 5431-81; Paul W. Hensley and Mary N. Hensley, docket No. 5432-81.↩
2. For purposes of this opinion the term partnership includes sole proprietorship. ↩
*. Sole proprietorship.↩
*. Sole proprietorship. ↩
1. Creekside, Inc., a Kentucky corporation whooly owned by Bollinger. ↩
2. Cloisters, Inc., a Kentucky corporation wholly owned equally by Bollinger and Martin. ↩
3. Greenland Vistas, Inc., a Delaware corporation in which petitioners had no interest.↩
3. Bollinger would first obtain a commitment for permanent financing, in which a financial institution, usually an insurance company, agreed to loan him the anticipated cost of the project after the project was completed. The actual funds for construction were obtained from another financial institution, usually a bank, through a construction loan. When the project was completed, Bollinger would use the permanent financing to pay off the construction loan.↩
4. The nominee agreement provided in pertinent part: WHEREAS, Bollinger proposes to construct apartments * * * in Lexington, * * * Kentucky. Said apartments to be known as Creekside Apartments * * *, and * * * WHEREAS, Citizens Fidelity Bank & Trust Company and Massachusetts Mutual Life Insurance Company have agreed to make such a mortgage loan, but have required that the real property securing such mortgage loan be held in the name of a corporation and such mortgage loan be made in the name of a corporation in order that such loan may bear an interest rate in excess of 7% per annum, and WHEREAS, Creekside has agreed to hold the Creekside Apartments for Bollinger as the agent and nominee of Bollinger for the sole and only purpose of securing both temporary and permanent financing of the Creekside Apartment project. NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter made, it is herein and hereby agreed by and between Bollinger and Creekside as follows: 1. Creekside will accept a deed from Beacon Hill, Inc. * * * and will immediately mortgage such property to either Citizens Fidelity Bank & Trust Co. or Massachusetts Mutual Life Insurance Company for the purpose of acquiring funds with which to pay the purchase price for such lot and construct said apartments. 2. Creekside admits and declares that it will hold such property as nominee and agent for Bollinger and will convey, assign or encumber the property and and disburse the proceeds thereof and dispose of the property, any purchase money, promissory notes, mortgages and trust deeds arising out of any sale thereof as and only as Bollinger may direct in writing. 3. Creekside does not obligate itself to care for or maintain the property or to advance money on account thereof whether for taxes or otherwise or to assume any liability for payment of money by execution of promissory notes or otherwise. 4. Bollinger does, herein and hereby, agree to indemnify and hold Creekside harmless from and against any liability it may or might sustain by reason of its acting as agent and nominee for Bollinger under the terms hereof.↩
5. We note that in the statutory notice, respondent maintained inconsistent positions with respect to the partnerships; he disallowed the loss deduction to the partners when the partnerships generated losses, but attributed the income to the partners in the latter years when most of the partnerships generated income.↩
6. In Roccaforte v. Commissioner,77 T.C. 263 (1981), revd. 708 F. 2d 986 (5th Cir. 1983), the Fifth Circuit reversed the finding of the Tax Court and held that the fifth factor is mandatory and absolute. 708 F. 2d at 989. However, in Ourisman v. Commissioner,82 T.C. 171 (1984), we disagreed with the Fifth Circuit's interpretation of National Carbide v. Commissioner,336 U.S. 422 (1949), and decided to continue to follow our decision in Roccaforte. Since appeal of the instant case lies to other than the Fifth Circuit, we are not required to follow the Fifth Ciecuit's decision in Roccaforte.Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F. 2d 985 (10th Cir. 1971). We note, however, that the Fifth Circuit concluded, in a situation where the same parties did not own a controlling interest in both the partnership and the corporation, that the purported principal, the partnership, was in fact not the owner of the purported corporate agent. See Moncrief v. United States,730 F. 2d 276↩ (5th Cir. 1984).
7. See Moncrief v. United States,730 F. 2d 276↩ (5th Cir. 1984) (On similar facts, the court upheld the jury's decision that the corporation acted as a true agent of the partnership because the corporate stock was held entirely by an individual who only had a 25 percent interest in the partnership and thus the partnership was in fact not the owner of the purported corporate agent.)