Langdon L. SKARDA, Carolyn A. Skarda, Lynell G. Skarda, Kathryn B. Skarda, Cash T. Skarda and Annabel S. Skarda, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 5617.

United States Court of Appeals Tenth Circuit.

Nov. 30, 1957.

Wentworth T. Durant, Dallas, Tex. (Lynell G. Skarda, Clovis, N. M., was with him on the briefs), for petitioners.

Melvin L. Lebow, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice,

Asst. Atty. Gen., Lee A. Jackson and A. F. Prescott, Attys., Dept. of Justice, Washington, D. C., were with him on the brief), for respondent.

Before PHILLIPS, MURRAH and BREITENSTEIN, Circuit Judges.

PHILLIPS, Circuit Judge.

Langdon L. Skarda, Lynell G. Skarda and Cash T. Skarda [1] and their respective wives filed a petition to review a decision of the Tax Court of the United States. It involves income tax deficiencies for the calendar years 1949 and 1950.

Langdon L. Skarda and his wife filed separate tax returns on the community property basis for 1949 and 1950. Lynell G. Skarda and his wife filed a joint income tax return for 1949 and separate income tax returns for 1950 on the community property basis. Cash T. Skarda and his wife filed a joint income tax return for 1949 and separate income tax returns for 1950 on the community property basis.

The taxpayers formed a partnership in 1942, known as Skarda Bros., for the original purpose of carrying on farming operations in the area surrounding Clovis, New Mexico. Until about 1946 the partnership was exclusively engaged in the farming business. Langdon Skarda, a non-practicing, licensed lawyer, was placed in charge of the partnership farming business. Lynell Skarda, in addition to his partnership interests, was engaged in the active practice of law in Clovis, New Mexico, having been admitted to the New Mexico bar in 1941. Cash Skarda was a non-practicing, licensed lawyer and was cashier of the Citizens Bank of Clovis.

Beginning in 1946, the partnership began to expand its operations, investing in the cattle business and in one instance in real estate. The partnership acquired and placed in the hands of an experienced cattle buyer substantial sums of money. The cattle buyer purchased cattle for pasturing and sale. He handled all the business of buying, feeding and selling.

Sometimes the partnership furnished pasture and feed. After fattening and selling the cattle, all expenses of the operation were paid and the profits divided between the partnership and the cattle buyer. In carrying on the cattle business, if a single operation was of substantial size, a special account was opened at the Citizens Bank of Clovis in the name of one partner who had authority to write checks on the account for that operation. From 1946 through the tax years involved there were eight cattle operations wherein the parties invested $443,041. The real estate business consisted of a single purchase of pasture land for $15,000.

In 1948 the taxpayers decided to enter the newspaper business in Clovis, New Mexico. In December, 1948, Langdon and Lynell Skarda purchased from E. A. Heinsohn Printing Machinery and Supplies [2] a printing press and allied equipment. On December 11, 1948, they made a partial payment for the press and equipment by a check drawn on the partnership account in the amount of $15,000. On the same date the partnership executed a conditional sales contract and an instalment promissory note for $23,426.32, being the balance of the purchase price. At the same time a supplemental agreement was entered into between the partnership and Heinsohn, in which it was agreed that the conditional sales contract would not be recorded so long as the instalment payments were made when due.

On December 12, 1948, Lynell Skarda, on behalf of the partnership, entered into contracts with King Features Syndicate, whereby the latter agreed to furnish the newspaper thereafter to be launched news stories, comic strips, a syndicated column and allied services. Some of the contracts with the King Features Syndicate were signed by Lynell G. Skarda and others were signed "Chronicle Publishing Co.," by Lynell G. Skarda. A check for $537.40, drawn on the partnership account was given to King Features Syndicate. From December 11, 1948, until

1. Hereinafter called the taxpayers.

2. Hereinafter called Heinsohn.

January 8, 1949, when a separate bank account was set up, many checks, totaling $16,604.91, drawn on the partnership account, were issued for expenditures in getting the newspaper started.

On December 22, 1948, the taxpayers filed articles of incorporation with the State Corporation Commission of New Mexico for the organization of the Chronicle Publishing Company. A certificate of incorporation was issued to the taxpayers by the Corporation Commission on December 22, 1948. The articles of incorporation and the certificate were duly filed in the County Clerk's office of Curry County, New Mexico. All filing fees were paid by the taxpayers. Notice of incorporation was duly published and proof of publication was filed with the State Corporation Commission on January 7, 1949. The articles of incorporation designated Lynell Skarda as statutory agent upon whom service of process could be made. The articles named the three taxpayers as incorporators, certified that each of them had subscribed for four shares of stock, and that they were to act as directors for the first three months after the filing of the certificate of incorporation. The articles provided that "The private property of the stockholders shall not be subject to the payment of corporate debts to any extent whatever."

There were no meetings of stockholders of the corporation, it adopted no by-laws, no officers were formally elected, no minute books were kept, no corporate stock was issued and no property was formally transferred by the partnership to the corporation.

On January 9, 1949, a checking account in the name of the Chronicle Publishing Company was opened at the Citizens Bank of Clovis and Lynell Skarda was authorized to draw checks on the account. Complete books of account were set up for the corporation, including a capital account. A credit to the capital account of $25,104.91 was entered in the corporation books on January 15, 1949. In such books it was described as follows: "1949. Item 1, January 15. Capital stock (Equipment purchased, Skarda Brothers, and cash advanced), credit, $25,104.91." This amount included $8,500 cash advanced by the partnership to the capital account of the company and $16,604.91 expended by the partnership before the corporation capital account was set up for equipment, supplies and personal expenses.

The newspaper commenced publication on March 20, 1949, and from the beginning was operated under the corporation name. The newspaper lost money from the outset, and between February 10, 1949, and December 5, 1949, 11 checks, totaling $68,000, were drawn on the partnership account in favor of the Chronicle Publishing Company. Between January 19, 1950, and October 13, 1950, six checks, totaling $16,300, were drawn on the partnership account in favor of the Chronicle Publishing Company. All of these checks bore the notation, "Loan." Each check was endorsed by the Chronicle Publishing Company by either "Lynell G. Skarda, President" or "Cash T. Skarda, Treasurer." On the same date that each check was drawn, a promissory note in the same amount as the check payable to "Skarda Bros." was issued and was signed by "Chronicle Publishing Co., a corporation By: Lynell G. Skarda, President Attest: Cash T. Skarda, Secretary."

On March 25, 1949, the conditional sales contract, note and supplemental agreement above referred to were cancelled. On the same date a new conditional sales contract, note and supplemental agreement were entered into between Heinsohn, as seller, and the Chronicle Publishing Company, as buyer. The new contract bore the corporate seal of the corporation and was signed by Lynell G. Skarda, as president and Cash T. Skarda, as secretary.

On May 4, 1949, the State Corporation Commission notified the corporation that its right to do business was forfeited for failure to file the required annual report for 1949. After receipt of the notice, the report was filed as required. The filing

of the delinquent report authorized the corporation to resume business.[3]

In October, 1949, to retain second class mail privileges, a statement of ownership was published in the Chronicle, in which it was stated that the taxpayers were sole stockholders in the Chronicle Publishing Company, a corporation. The corporation secured an employer's identification number, filed quarterly returns of income tax withheld, and filed an employer's tax return as a corporation in 1949. A final employer's quarterly Federal tax return was filed by the corporation in 1950.

In 1949 and 1950, the corporation operated in its corporate name and in that name ordered supplies, received normal short-term commercial credit and paid bills by checks drawn on its corporate bank account.

From the inception of the newspaper business, it was understood that Lynell Skarda was to be in full charge. He worked from 10 to 11 hours a day trying to put the newspaper on a sound financial basis. He acted as general manager, kept the corporation's books, solicited advertising, wrote editorials, and set the policies of the newspaper. All obligations incurred in the operation of the newspaper, after January 8, 1949, were paid by checks, aggregating about 3,000, drawn on the Chronicle Publishing Company account in the Citizens Bank of Clovis.

The newspaper ceased publication February 1, 1950. Efforts were made to sell it in November and December of 1949 for $50,000, but were unsuccessful.

After suspension of publication the assets of the company were disposed of. Final disposition was made in 1951, when the printing press, the last item of equipment, was sold.

In the partnership return of income, filed by Skarda Brothers for 1949, the partnership claimed a loss of $31,000 for bad debts owed it by the Chronicle Publishing Company. For 1950 the partnership made a like claim of loss for debts owed it by the Chronicle Publishing Company in the amount of $39,530.71. They arrived at the losses claimed in 1949 by subtracting the estimated value of the plant from the debts which the corporation owed Heinsohn and the partnership. The losses in 1950 were arrived at by totaling the advances made to the corporation by the partnership which were not charged off in 1949 and adding that figure to the amount lost and estimated to be lost in the disposition of the plant and materials.

The Commissioner determined that the bad debt deductions claimed were not allowable because the debts were nonbusiness in nature and were not entirely worthless at the end of 1949 or 1950.

In the proceeding before the Tax Court the partners contended: (1) That the Chronicle Publishing Company never came into existence as a corporation; or (2) That if the corporation did come into existence it should be disregarded as a sham; or (3) If the corporation should not be regarded as a sham that it should be regarded as having been an agent of the partnership and that, therefore, in any of such events, all of the expenses incurred or losses sustained in the operation of the newspaper were expenses and losses of the taxpayers, and (4) Alternatively, they contended that if the decision should be adverse on the first three contentions, then the bad debts resulting from the money loaned to the corporation by the partnership should be considered as business bad debts and allowed as deductions by the partnership for 1949 and 1950. The Tax Court decided each of the four contentions adversely to the taxpayers.

■ Under the provisions of N.M. Stat.Ann.1953, Vol. 8, § 51–2–11; N.M. Stat.Ann.1941, Vol. 4, § 54–211, the incorporators, Langdon L. Skarda, Lynell G. Skarda and Cash T. Skarda, upon the filing of the certificate of incorporation of the Chronicle Publishing Company, became and constituted a body corporate by the name set forth in such certificate.

■ For tax purposes, where the purpose for the creation of the corporation

3. N.M.Stat.Ann.1953, Vol. 8, § 51–2–36; N.M.Stat.Ann.1941, Vol. 4, § 54–2–36.

is a business one or the creation is followed by business activity, the corporate entity will not be disregarded.[4]

■■ Complete stock ownership and control resulting from such ownership are not of significance in determining tax liability. The fact that the taxpayers exercised complete dominion and control over the corporation, were in charge of its administration and management, and fully directed its policies does not justify disregarding the corporate entity for tax purposes.[5]

■■ Where the purpose for creating the corporation is to gain an advantage under the law of the state of incorporation, relieve the stockholders from personal liability for debts created by the corporation, or serve the creator's personal convenience, so long as that purpose is the equivalent of business activity, or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. Where the taxpayer, for business purposes of his own, adopts the corporate form for carrying on a business, the choice of corporate advantage to do business requires acceptance of the tax disadvantages.[6]

Here, the corporation came into existence as a legal entity on December 22, 1948. The business purpose of the corporation, as stated in its articles of incorporation, was to start, acquire, print, publish and circulate a newspaper.

Upon the coming into being of the corporation, the contracts entered into for the purchase of the printing press and equipment by the partnership were cancelled and new contracts entered into by the seller and the corporation. A bank account was opened and maintained in the corporate name; complete books of account were set up for the corporation,

which included a capital account; publication of the newspaper was commenced on March 20, 1949, and thereafter carried on in the corporate name; the taxpayers caused to be published in the newspaper a sworn statement that the business was that of a corporation and they were its sole stockholders; and in order to retain second-class mail privileges the taxpayers caused the corporation to state that it was the owner of the newspaper. The corporation had a corporate seal, which it used in the execution of contracts. The corporation in its capital account was credited with the press and other equipment purchased and with cash advanced by the taxpayers to the corporation. The corporation hired employees, secured an employer's identification number and filed returns of Federal income taxes withheld and filed an employer's tax return. The entire business of the newspaper was transacted in the corporate name. The corporation obtained normal short-term commercial credit from those with whom it dealt. It issued approximately 3,000 checks on its corporate bank account.

■■ The taxpayers treated the corporation as an entity separate from themselves. When they made loans to the corporation they took back promissory notes in which the corporation was maker and the partnership payee. After the corporation's right to continue business was forfeited through failure to file the required annual report, the taxpayers caused the corporation to file such report and restore its right to transact business.

While there were no formal stockholders' meetings or directors' meetings, the three incorporators were named as directors to act for the corporation for the first three months of its existence and they continued as directors until their successors were elected.[7] Lynell G. Skar-

4. National Carbide Corp. v. Commissioner, 336 U.S. 422, 429, 69 S.Ct. 726, 93 L. Ed. 779; Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 439, 63 S.Ct. 1132, 87 L.Ed. 1499.

5. National Carbide Corp. v. Commissioner, 336 U.S. 422, 429, 433, 69 S.Ct. 726, 93 L.Ed. 779; See also: Burnet v. Commonwealth Improvement Co., 287 U.S. 415, 53 S.Ct. 198, 77 L.Ed. 399.

6. Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438–439, 63 S.Ct. 1132, 87 L.Ed. 1499.

7. Fletcher Cyclopedia Corporations, Rev. Perm.Ed.1931, Vol. 2, Ch. 11, § 344.

da and Cash T. Skarda acted as president and secretary, respectively, of the corporation and it is a reasonable inference that they were informally authorized so to do by the three incorporators, although no formal election was had at a board of directors' meeting. The articles signed by the incorporators certified that each of the three incorporators had subscribed for four shares of stock. The corporation acquired a capital in excess of $25,000. That capital was furnished by the incorporators and was, in our opinion, a substantial compliance with N.M. Stat.Ann.1953, Vol. 8, § 51–4–2; N.M. Stat.Ann.1941, Vol. 4, § 54–1102. Lynell Skarda testified that such capital was provided for the corporation for the purpose of its incorporation.

Moreover, statutory conditions to the right to engage in business, to be performed after the corporation has been formed, are conditions subsequent, and while a non-compliance therewith may give the state a right to proceed to forfeit the franchise, such non-compliance in the absence of such proceeding does not in anywise affect the legal existence of the corporation.[8]

We think it clear that the corporation was created for a business purpose; that it engaged in business activities, and that the purposes which led the taxpayers to organize the corporation were effectuated.

The contention of the taxpayers that if a separate corporate entity existed, the corporation was its agent or instrumentality is without merit. A like contention was made and rejected in National Carbide Corp. v. Commissioner, 336 U.S. 422, 428–429, 69 S.Ct. 726, 93 L.Ed. 779 and Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 439, 63 S.Ct. 1132, 87 L.Ed. 1499.

We conclude that the corporation for tax purposes should be considered as a distinct corporate entity.

The final contention made by the taxpayers depends on whether the taxpayers were entitled to deduct losses resulting to them on account of loans made by the partnership to the corporation, either under § 23(k) (1) or § 23(k) (4) of the Internal Revenue Code of 1939, 26 U.S. C.A. § 23(k) (1, 4).

Section 23(k) (1) provides for the charge-off of a part of a debt which has become worthless. Section 23(k) (4) contains no such provision. Under the latter section it is only when a debt becomes totally worthless during a taxable year that a deduction may be made. The taxpayers do not contend that the debts became totally worthless during the taxable year. Hence, they were not entitled to make a deduction under § 23(k) (4).

Section 23(k) (1) does not apply, in the case of a taxpayer other than a corporation, to a nonbusiness debt. In determining whether a debt is business or nonbusiness, the inquiry is whether the loss has a proximate relationship to any trade or business engaged in by the taxpayer at the time of the loss.[9]

In order for the taxpayers to be entitled to a deduction under § 23(k) (1), it was necessary for the taxpayers to show that at the time of the loss they were in the business of promoting, financing and managing business enterprises, or were in the business of loaning money to business enterprises.

The Tax Court found that the taxpayers were not in either of such businesses and that the losses did not have a proximate relationship to any trade or business engaged in by the taxpayers at the time of the loss. Those

8. Fletcher Cyclopedia Corporations, Rev. Perm.Ed.1931, Vol. 8, Ch. 45, § 3802; Id., Vol. 1, Ch. 7, § 130; W. L. Wells Co. v. Gastonia Cotton Manufacturing Co., 198 U.S. 177, 185, 186, 25 S.Ct. 640, 49 L.Ed. 1003; Midwest Air Filters Pacific v. Finn, 201 Cal. 587, 258 P. 382, 384–386.

9. Pokress v. Commissioner of Internal Revenue, 5 Cir., 234 F.2d 146, 150; Hickerson v. Commissioner of Internal Revenue, 2 Cir., 229 F.2d 631; Treasury Regulations 111, § 29.23(k)–6, Gulledge v. Commissioner, 4 Cir., 249 F.2d 225.

**436**

findings were fully supported by the evidence.

Activities devoted to a single corporation and loans made to a single corporation do not constitute the trade or business of promoting, financing, and managing or loaning money to business enterprises.[10]

Accordingly, we conclude that the taxpayers were not entitled to deduct such losses.

Affirmed.

---

10. Commissioner of Internal Revenue v. Schaefer, 2 Cir., 240 F.2d 381, 383; Hickerson v. Commissioner, 2 Cir., 229 F.2d 631, 633, 634; Nicholson v. Commissioner, 10 Cir., 218 F.2d 240, 242–243. Gulledge v. Commissioner, 4 Cir., 249 F.2d 225.