J. R. BETSON, JR., AND JOAN SUE BETSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Betson v. Commissioner
Docket No. 2437-78.
United States Tax Court
T.C. Memo 1984-264; 1984 Tax Ct. Memo LEXIS 411; 48 T.C.M. (CCH) 113; T.C.M. (RIA) 84264; May 15, 1984. Ronald K. Van Wert, for the petitioners. Dennis Brager, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT *412 AND OPINION PARKER, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Addition to Tax
Addition to Tax
Year
Deficiency
Section 6653(a) [1]
Section 6651(a)
1970
$61,492.58
$3,101.54
$3,079.14
1971
81,756.86
4,087.84
1972
75,280.88
3,797.79
7,195.59
After numerous concessions by both parties, the issues remaining for decision are: (1) whether petitioners are entitled to any deductions on their joint income tax returns for taxable years 1970 to 1972, inclusive, in connection with the operation of four liquor stores in New Mexico, and (2) whether petitioners are liable for additions to tax for negligence under section 6653(a) for taxable years 1970 to 1972, inclusive. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.
The petitioners, J. R. Betson, Jr. and Joan Sue Betson, were husband and *413 wife during calendar years 1970 through 1972 and resided in Newport Beach, California at the time they filed the petition in this case. They filed joint Federal income tax returns for taxable years 1970 through 1972 with the Internal Revenue Service Center in Fresno, California. For convenience, the term petitioner in the singular will hereinafter refer only to J. R. Betson, Jr. Petitioner is a medical doctor, specializing in obstetrics. He is licensed as a physician in the States of New Mexico, Oklahoma. and California. He is also certified by the American Board of Obstetrics and Gynecology. Although licensed in three states, during the years 1970 through 1972 petitioner restricted his medical practice to the Newport Beach, California area. Petitioner is also a director of Sunwest Bank (formerly Santiago Bank) in Tustin, California, having accepted such position in 1970. Petitioner was chairman of the board of directors of Sunwest Bank from 1973 to approximately 1976 or 1977.As part of his duties as a director, petitioner, with the aid of the bank's management, routinely reviewed the bank's financial statements. On October 22, 1966, petitioner purchased a business known *414 as the Wine nd Liquor Shoppe. As part of such purchase, petitioner entered into a lease assignment agreement through which he became the lessee of the premises of a liquor store located in the Winrock Shopping Center in Albuquerque, New Mexico. Petitioner was also assigned a leasehold interest in New Mexico liquor license No. 96, under which petitioner's assignor had previously been operating. Liquor license No. 96 was owned by Winrock Enterprises, Inc.A business known as Diamond Jim's was the co-lessee of liquor license No. 96. [2] Petitioner originally operated his newly acquired liquor business under the name Winrock Economy Liquors (Winrock). However, this store was also subsequently referred to as Western Wine and Liquor Marts No. I. At some time prior to 1970, petitioner had purchased in his individual *415 name New Mexico liquor license No. 327. Liquor license No. 327 was used in connection with the operation of the Bellas Hess Liquor Store (Bellas Hess), a retail liquor store located in the Bellas Hess Department Store in Albuquerque, New Mexico. The Bellas Hess Liquor Store was also subsequently known as Western Wine and Liquor Marts No. III. [3]
Petitioner's legal counsel with respect to the liquor operations was Mr. Turner W. Branch, *416 a licensed attorney practicing in Albuquerque, New Mexico. Petitioner retained Mr. Branch as legal counsel for the liquor operations due to his previous experience as the Director of Alcoholic Beverage Control for the State of New Mexico. On January 14, 1970, Mr. Branch, pursuant to petitioner's instructions, filed Articles of Incorporation with the New Mexico State Corporation Commission covering an entity to be known as Bethinol Corporation (hereinafter Bethinol). The Articles of Incorporation provided, in part, that: THIRD: The purpose or purposes for which the corporation is organized are: 1. To engage in the retail and wholesale sale of alcoholic beverages of all types throughout the State of New Mexico and to own and operate bars, lounges and package stores throughout the State of New Mexico; and to do any and all things reasonable or beneficial to carrying out the foregoing purposes. The Articles of Incorporation were signed by petitioner as the incorporator. The initial board of directors consisted of petitioner, Mr. Branch, Bill Baldwin, and Lewis B. Nance. During all the years at issue herein, petitioner also served as president and chairman of the board of *417 Bethinol. A Certificate of Incorporation for Bethinol was issued on January 14, 1970, by the State Corporation Commission of New Mexico. No stock certificates of Bethinol were ever issued. Very few shareholders' or directors' meetings were held. However, petitioner at all times considered Bethinol to be a separate entity from his own person. Subsequent to incorporation, Bethinol acquired two other New Mexico liquor licenses under its own name. In May of 1970, Bethinol leased liquor license No. 767 from Fred Harvey, Inc., an Illinois corporation. By a separate security agreement, dated May 25, 1970, petitioner pledged license No. 327 (Bellas Hess) as security for the performance of Bethinol's obligations under this lease with Fred Harvey, Inc. License No. 767 was used in connection with Bethinol's operation of a liquor store at a Pizza Hut store (Pizza Hut) located at 9620 Menaul Boulevard, N.E., Albuquerque, New Mexico. Bethinol was leasing a portion of the Pizza Hut in which to operate a liquor store. The Pizza Hut liquor store was also subsequently referred to as Western Wine and Liquor Marts No. II. In July of 1970, Bethinol purchased a retail liquor store known as *418 Western Liquors. New Mexico liquor license No. 438 was one of the assets of the purchased business. Bethinol used this license in its operation of a retail liquor store in Hobbs, New Mexico. This liquor store was commonly referred to as the Hobbs Store (Hobbs). The store was also sometimes referred to as Western Wine and Liquor Marts No. IV. At or about July 1970, petitioner was contemplating transferring to Bethinol liquor license No. 327, used in connection with the Bellas Hess Store, and requested through Mr. Branch that the New Mexico Department of Alcoholic Beverage Control transmit the appropriate documents to execute such transfer. Petitioner had previously represented to Bellas Hess, Inc., the owner of the Bellas Hess Department Store, that license No. 327 was in fact listed in Bethinol's name. Mr. Branch thought that a transfer of that license had been made, but no formal transfer of the license ever took place. Bethinol's accountants carried liquor license No. 327 of the corporate balance sheet as a corporate asset beginning in January 1972. At this same time, petitioner also requested through Mr. Branch the forms that were necessary to designate Bethinol as the *419 "agent-lessee" of license No. 96, in use at the Winrock store. [4] However, no such designation was ever formally made. For the years here in issue, Bethinol was engaged in the trade or business of operating retail liquor stores, with its main office located at 35 Winrock Center, N.E., Albuquerque, New Mexico. The management functions of Bethinol were subsequently transferred to California so that petitioner could more closely scrutinize corporate operations. U.S. Corporation Income Tax Returns (Forms 1120) were filed by Bethinol in each of the taxable years 1970 to 1972, reporting losses of $48,520, $58,644, and $91,923, respectively. Those corporate tax returns were signed by petitioner as the president of the *420 corporation. Bethinol purchased the alcoholic beverages for all four liquor stores: Bellas Hess, Winrock, Pizza Hut, and Hobbs. Petitioner's stated reason for this practice was to obtain price discounts through volume purchases. The alcoholic beverages were then distributed to the four stores for sale to the public. In April of 1970, Mr. Branch registered the trademark "Western Wine and Liquor Marts" with the State of New Mexico. This trademark, as well as a "double horseshoe logo," was used by Bethinol on its advertisements and stationery as early as January 1971. The letterhead of that stationery recited that Western Wine and Liquor Marts was "A Division of The Bethinol Corp." Petitioner, Branch, and various employees of Bethinol made numerous representations to customers, business persons, and public officials that the four liquor stores were all being operated by Bethinol, and that Bethinol was doing business as Western Wine and Liquor Marts. The four liquor stores were commonly referred to as Western Wine and Liquor Marts Nos. I through IV. Payroll checks that were written on Bethinol's checking account with First National Bank in Albuquerque also indicated that Bethinol *421 was doing business as Bellas Hess and Winrock Liquors. These payroll checks were cashed at the particular store upon the payee's endorsement. The checks were then restrictively endorsed for deposit only by Bethinol, doing business as Bellas Hess or Winrock Liquors. Through May 1970, Bellas Hess and Winrock each filed separate gross receipts tax returns with the State of New Mexico, Bureau of Revenue, under identification numbers 01-037188-91 and 01-501471-91, respectively. During 1970, the gross receipts identification numbers were consolidated into identification number 01-753760-00, which was assigned to Bethinol. From this time through the end of 1971, gross receipts tax returns that included the receipts from all four stores were filed in Bethinol's name. The parties do not have copies of the gross receipts tax returns for 1972, but there is no indication that any change in treatment of gross receipts tax returns occurred in 1972. During the years in issue, Bethinol maintained accounts at various banks in New Mexico. Bethinol maintained an account at the First National Bank of Lea County, the First National Bank of Hobbs in Hobbs, New Mexico, and the First National Bank *422 in Albuquerque, Winrock Branch. [5] During 1972 the gross receipts from all four liquor stores were deposited into bank accounts maintained by Bethinol. The record does not indicate that any of the four liquor stores maintained any bank account separate from these corporate accounts. Throughout the periods here in issue, Bethinol also borrowed various amounts of money from these banks for use in its liquor operations.For example, in 1971, Bethinol borrowed $50,000 from the First National Bank in Albuquerque in a single transaction. Petitioner personally guaranteed some of these loans. In 1972, Bethinol hired a Mr. Corliss to perform construction work at the Bellas Hess and Winrock stores. Bethinol paid for that work. In 1972, a complaint was filed against petitioner and Bellas Hess for violation of Regulation 13 of the New Mexico Department of Alcoholic Beverage Control with respect to license No. 327 by permitting a person or entity other than the licensee or designated agent to operate the premises. Petitioner requested Mr. Branch to handle "that and any *423 other legal matters pertaining to Bethinol Corp." The record does not indicate the outcome of this matter. [6]
Beginning in 1970 and lasting through calendar year 1972, Bethinol retained Kelly, McCarthy & Capels, Ltd. (KMC) to perform accounting services for Bethinol. Corporate tax returns (Forms 1120) for Bethinol were prepared by KMC for 1970, 1971, and 1972. *424 In 1970 a physical inventory of the merchandise on hand in Bethinol's Albuquerque stores as of March 1, 1970 was conducted by KMC. The items at Bellas Hess and Winrock were included in such inventory. The inventory also included those items at Charlie's Liquors (see footnote 3, supra.). The record does not indicate that petitioner or anyone else associated with Bethinol ever suggested that it was erroneous to include the items at Bellas Hess and Winrock in Bethinol's inventory. In computing the corporate income tax liability for each of the years in issue, KMC treated the gross receipts and expenses from all four stores as corporate gross receipts and expenses. The corporate income tax returns for each year were signed by petitioner in his capacity as president of Bethinol. Neither petitioner nor anyone else associated with Bethinol ever suggested to KMC that it was incorrect to include the gross receipts and expenses of Bellas Hess and Winrock in computing Bethinol's taxable income. KMC also prepared the balance sheets and profit and loss statements for Bethinol for the years in issue. In determining Bethinol's gross profit or loss, the gross receipts and expenses *425 of all four stores were treated as gross receipts and expenses of Bethinol. Both petitioner and his personal accountant, Mr. Leventis, [7] reviewed the balance sheets and profit and loss statements of 1970-1972 shortly after their issuance. Petitioner was aware that Bethinol's profit and loss statements included losses for the Bellas Hess and Winrock stores and discussed this fact with Mr. Leventis. Neither petitioner nor Mr. Leventis ever suggested to KMC that it was incorrect to include the gross receipts and expenses of Bellas Hess and Winrock in computing Bethinol's profit or loss. [7]
Beginning in January 1972, KMC began reflecting liquor license No. 327, used at Bellas Hess, on the corporate books and records as a corporate asset of Bethinol. Neither petitioner nor anyone else ever suggested to KMC that it was erroneous to treat license No. 327 as a corporate asset of Bethinol. *426 License No. 327 had not previously been listed as a corporate asset, because January 1972 was the first time such information was made available to KMC. From the record, it appears that KMC often had problems in obtaining information from Bethinol, especially from petitioner who had moved the corporate headquarters from Albuquerque, New Mexico, to Newport Beach, California. KMC received information directly from the four liquor stores, however, and the financial statements it prepared were compiled primarily from that information. The four liquor stores had combined operating losses of $37,000 and $25,000 for calendar years 1970 and 1971, respectively. These stipulated losses apparently represent actual out-of-pocket expenses and differ from the loss figures reported on the corporate tax returns for those years.During 1972, petitioner wrote checks on his personal bank account in connection with the liquor store operations totalling $175,365.89. Of this total amount, the parties have stipulated that $138,478.68 is deductible either by Bethinol or petitioner, depending upon the resolution of the issues in this case. This $138,478.68 includes the loss claimed on Bethinol's *427 corporate income tax return filed for 1972 in the amount of $91,923. The expenditures resulting in the total figure of $138,478.68 arose out of various transactions. Of the total amount of $138,478.68 in issue, $62,292 represents money petitioner paid to New Mexico Selling Company, Pucci Distributing Company, and State Distributing Company in settlement of lawsuits they brought against Bethinol and petitioner. New Mexico Selling Company, Pucci Distributing Company, and State Distributing Company were all liquor wholesalers in New Mexico. These lawsuits were to recover unpaid beverage purchases through 1971. As a result of the various lawsuits filed against Bethinol and petitioner, petitioner was required personally to guarantee payment of Bethinol's accounts with some of the liquor wholesalers before they would agree to continue to make credit sales to Bethinol. The record does not clearly indicate whether any of the 1972 payments made by petitioner were in discharge of any such guarantor liability. [8]
Of the total *428 $138,478.68 in issue, there were payments to other liquor wholesalers in addition to the $62,292 resulting from the three lawsuits mentioned above. However, the record is not clear whether such payments resulted from litigation by these other wholesalers or whether petitioner paid them in advance of litigation. [9]
The remainder of the total expenditures was paid by petitioner to discharge various types of obligations arising out of Bethinol's operation of the liquor stores. For example, some of these expenditures were in repayment of loans procured by Bethinol to acquire operating funds for its business; [10] some were in payment of overdue rent and taxes of the stores; and some were to pay Mr. Branch for his services in handling the litigation brought against Bethinol and petitioner by the various liquor wholesalers. All of the expenditures related to Bethinol's trade or business of operating retail liquor stores. *429 The reasons underlying petitioner's payment of Bethinol's expenses in 1972 were numerous. First, it was petitioner's understanding that he would be personally liable for some of these debts as the record owner of license No. 327 (Bellas Hess). Second, petitioner had personally guaranteed many of the obligations, and he felt that failing to pay them would injure his personal credit status and affect his ability to borrow money in the future. Third, petitioner felt failure to pay the liquor wholesalers could possibly result in a loss of license No. 327 through foreclosure proceedings. Finally, due to the problems Bethinol experienced in keeping its credit account with certain wholesalers current, several wholesalers had stopped making credit sales to Bethinol until the account was paid. A few of the checks written by petitioner in payment of these various expenses bore the notation "Loan to Bethinol Corp." or "Loan to Corp." Most of the checks did not bear such a notation. [11] Some of the checks written by petitioner during 1972 were recorded on Bethinol's books as "notes payable--Dr. Betson." Other checks were not reflected on Bethinol's books, but the parties cannot agree *430 as to the amount thereof. Petitioner did not receive a promissory note with respect to any of these payments, nor were any interest payments ever made to petitioner. Petitioner at all times relevant herein expected that the corporation would repay him for these expenditures, either in the form of salary or something else. However, he did not expect such repayment to occur until the corporation became a profitable venture. As of the end of 1972, petitioner still hoped the corporation would become profitable. Neither petitioner nor his spouse has ever prepared any of the joint returns filed during their marriage. Instead, they always used professional assistance to prepare their returns. During tax years 1970 to 1972, inclusive, petitioner retained John A. Leventis for this purpose. Petitioner retained Mr. Leventis because he was a certified public accountant and also a former Internal Revenue agent. During the years in issue, Mr. Leventis *431 performed all of petitioner's personal accounting and tax services, as well as providing business advice. Petitioner gave all of his personal books and records, checks and other financial data to Mr. Leventis, and the returns were prepared from this data. Mr. Leventis also had copies of the Bethinol financial statements prepared by KMC. Mr. Leventis would present the prepared return to petitioner and his wife for their signature shortly before such returns were due to be filed. [12] Neither petitioner nor his wife ever reviewed their returns prior to signing them. On their 1970 joint return, petitioners claimed a loss of $16,616.36 from a "joint venture" purportedly consisting of Bellas Hess Liquors, Winrock Liquors, and Charlie's Liquors. See footnote 3. No loss arising from the liquor store operations was claimed on petitioners' 1971 joint return. On their joint return for *432 1972, petitioners claimed a loss from a partnership listed as Bethinol Enterprises in the amount of $111,393.35. By statutory notice of deficiency dated December 8, 1977, respondent disallowed the claimed loss deductions in full. ULTIMATE FINDINGS OF FACT (1) Bethinol Corporation was a valid corporation for Federal income tax purposes, and was a taxable entity separate from petitioner. (2) The Winrock, Pizza Hut, Bellas Hess, and Hobbs Liquor Stores, also known as Western Wine and Liquor Marts Nos. I through IV, respectively, were operated by Bethinol not by petitioner in his individual capacity. (3) Bethinol was not acting as an agent of petitioner, but acted in its own behalf in conducting the liquor store operations at the four locations. (4) The payments by petitioner were either loans to Bethinol or contributions to the capital of that corporation. (5) Petitioners' underpayments of tax for each of the years were due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). OPINION The parties have stipulated the amount of loss from the liquor store operations each year and that a total amount of $138,478.68 is *433 deductible by either petitioner or Bethinol Corporation. Bethinol reported the expenses and operating losses on its corporate tax returns; petitioner deducted most of the net losses on his personal returns. The primary issue we must decide is who is entitled to the deductions: petitioner or Bethinol. Petitioner has advanced several arguments in support of his claimed entitlement to the loss deductions. However, for the reasons stated below, we agree with respondent that petitioner is not entitled to deduct the loss under any of his theories. Petitioner first contends that Bethinol should be disregarded as a separate taxable entity for Federal income tax purposes, asserting in effect that Bethinol was not validly created. In support of this position, petitioner cites the fact that no stock certificates were ever issued and that Bethinol never received the $1,000 required by its Articles of Incorporation as a prerequisite to commencement of business. [13]
*434 Whether a corporation ever came into existence is a matter of local state law. Stoody v. Commissioner,66 T.C. 710, 716 (1976); Skarda v. Commissioner,27 T.C. 137, 144 (1956), affd. 250 F. 2d 429 (10th Cir. 1957). [14] However, whether the corporate entity (if found to exist) should be disregarded for purposes of Federal taxation is a question of Federal law. Stoody v. Commissioner,supra,66 T.C. at 716-717; Carver v. United States,188 Ct. Cl. 202, 412 F. 2d 233 (1969). At the time the Articles of Incorporation for Bethinol were filed, New Mexico law (N.M. Stat. Ann. § 51-25-4 (1967)) provided that: Upon the issuance of the certificate of incorporation, the corporate existence shall begin, and the certificate of incorporation shall be conclusive evidence that all conditions precedent required to be performed by the incorporators have been complied with and that the corporation has been incorporated under *435 the Business Corporation Act…, except as against this State in a proceeding to cancel or revoke the certificate of incorporation or for involuntary dissolution of the corporation. A Certificate of Incorporation was issued to Bethinol on January 14, 1970. Thus, Bethinol's corporate existence began on that day and the Certificate of Incorporation is conclusive as against all but the State of New Mexico that all the conditions precedent to the creation of a valid corporation have been fulfilled.Receipt of the stated consideration prior to engaging in business and compliance with other corporate formalities to be performed after the corporation has been formed (such as the issuance of stock, adoption of bylaws, and maintaining minutes of shareholders' or directors' meetings) are conditions subsequent. While noncompliance with these conditions subsequent may give the State of New Mexico the right to proceed to forfeit the corporate charter, such noncompliance does not in any way affect the legal existence of the corporation absent such state action. *436 Strong v. Commissioner,66 T.C. 12 (1976),affd. by order 553 F. 2d 94 (2d Cir. 1977); Carver v. United States,supra;Skarda v. Commissioner,250 F. 2d 429, 433-435 (10th Cir. 1957), affg. 27 T.C. 137 (1956); Scott Graphics, Inc. v. Mahaney,89 N.M. 208, 549 P. 2d 623 (Ct. App.), cert. denied 89 N.M. 322, 551 P. 2d 1369 (1976). Having concluded that a valid corporation existed, we next consider whether the corporate entity should be disregarded for purposes of applying the Federal income tax laws. The leading case in this area is Moline Properties, Inc. v. Commissioner,319 U.S. 436 (1943), in which the Supreme Court held that the corporate entity will not be ignored where it is created for a business purpose or it actually conducts business following incorporation. The degree of corporate business purpose or the quantum of business activity required for recognition of the separate existence of a corporation is rather minimal. *437 Hospital Corp. of America v. Commissioner,81 T.C. 520, 579-580 (1983); Strong v. Commissioner,supra at 24; Stoody v. Commissioner,supra at 717. Moreover, it is clear that the Moline Properties test imposes alternative requirements: the presence of either a corporate business purpose or the conduct of business activity following incorporation mandates recognition of the corporation for Federal income tax purposes. O'Neill v. Commissioner,271 F. 2d 44, 49 (9th Cir. 1959), and cases cited therein; Hospital Corp. of America v. Commissioner,supra at 579; Lomas Santa Fe, Inc. v. Commissioner,74 T.C. 662, 674-675 (1980), affd. 693 F. 2d 71 (9th Cir. 1982). On the facts before us, either branch of the Moline Properties test is met, requiring recognition of Bethinol as a separate taxable entity. Even if we accept petitioner's testimony that the sole purpose in forming Bethinol was to obtain price discounts through volume purchases, we think that is a business purpose requiring recognition of the corporation under the first branch of the Moline Properties *438 test. Petitioner asserts that he remained personally liable for Bethinol's debts under New Mexico law as the record owner of New Mexico liquor license No. 327 (Bellas Hess), and therefore gained no advantage from incorporation. That assertion is meritless. Even assuming petitioner was personally liable, a point of law on which we remain unpersuaded, the Supreme Court in Moline Properties used the gaining of an advantage under applicable state law merely as an illustration of one business purpose requiring recognition of the corporation for Federal income tax purposes, not as a limitation as to which business purposes would suffice. In short, regardless of whether petitioner remained personally liable, a matter as to which there is substantial doubt, the business purpose of obtaining price discounts through volume purchases requires recognition of Bethinol as a separate taxable entity. Moreover, the second branch of the Moline Properties test is also satisfied since Bethinol carried on substantial business activities subsequent to incorporation. Bethinol acquired property in its own name, acquired two liquor licenses in its own name, purchased the alcoholic beverages for *439 all four stores, admittedly operated two of the liquor stores and in fact operated all four stores, and employed numerous persons in connection therewith, to name some of the business activities conducted by Bethinol. Therefore, it is clear that Bethinol was a separate taxable entity and must be recognized as such for Federal income tax purposes. In fact, petitioner testified that he at all times considered Bethinol to be an entity separate from himself. Petitioner next asserts that Bethinol was merely his agent and that he, as the principal, is entitled to any deductions arising from Bethinol's operation of the liquor stores. We have recently had occasion to reiterate our position that a corporation may, under the proper facts and circumstances, be considered merely as an agent. Ourisman v. Commissioner,82 T.C. 171 (1984). It is equally clear, however, that ownership and control alone will not make a corporation the agent of its shareholder or shareholders. Moline Properties, Inc. v. Commissioner,supra; *440 National Carbide Corp. v. Commissioner,336 U.S. 422, 437 (1949); Ourisman v. Commissioner,supra,82 T.C. at 177-178.The facts in this case do not support a finding of corporate agency under any of the tests laid down in those decisions. In National Carbide Corp. v. Commissioner,supra,336 U.S. at 437, the Supreme Court stated that: Whether the corporation operates in the name and for the account of the principal, binds the principal by its actions, transmits money received to the principal, and whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case. Its business purpose must be the carrying on of the normal duties of an agent * * *. [Footnote omitted.] Evaluation and consideration of the National Carbide factors convince us that Bethinol was not merely petitioner's corporate agent.See *441 Ourisman v. Commissioner,supra;Roccaforte v. Commissioner,77 T.C. 263 (1981),revd. 708 F.2d 986 (5th Cir. 1983). Bethinol operated in its own name and for its own account, not petitioner's. Petitioner, Mr. Branch, and various employees of Bethinol made numerous public representations that Bethinol was the principal in the liquor store operations and that Bethinol was doing business as Western Wine and Liquor Marts Nos. I through IV. The record is devoid of any evidence that Bethinol was at any time represented to third parties as petitioner's agent, or that such third parties in fact understood this to be the case. We are also not persuaded that Bethinol bound petitioner by its actions. Petitioner has urged repeatedly that he was personally liable under New Mexico law for some of Bethinol's debts as the record owner of New Mexico liquor license No. 327 (Bellas Hess). Petitioner has not satisfactorily demonstrated to us that he was personally liable for such debts. Moreover, the fact that third-party creditors often required petitioner personally to guarantee Bethinol's debts indicates to us that petitioner's liability, *442 absent such guarantees, was not free from doubt. The record also lacks any evidence that Bethinol ever transmitted any of the money it received to petitioner. Indeed, the parties have stipulated that all of the money received in 1972 was deposited in bank accounts maintained by Bethinol. The money received by Bethinol was not attributable to the services of employees of petitioner or assets belonging to petitioner. Bethinol had its own group of employees whose activities produced Bethinol's income. Bethinol used its own assets in producing such income. Although petitioner asserts that liquor license No. 327 (Bellas Hess) and the lease of liquor license No. 96 (Winrock) were never formally transferred to Bethinol, we think the record clearly supports a conclusion that such a transfer was both contemplated by petitioner and did occur for all practical purposes. Petitioner's argument that Bethinol's operation of such licenses without a formal transfer thereof would violate New Mexico law assumes too much. That such conduct might have been illegal does not mean such conduct did not in fact occur. In this regard, we note a complaint was filed against petitioner and Bellas Hess *443 with respect to license No. 327, alleging a violation by reason of a person or entity other than the licensee or designated agent operating the premises, the very conduct which petitioner asserts he could not do since it was in violation of state law. In addition we think Bethinol's relations with petitioner were wholly dependent upon petitioner's ownership of Bethinol. Indeed, we can ascertain no other basis for their relationship. Moreover, whether or not this factor can be considered as determinative, the present case is otherwise wholly distinguishable on its facts from the situations in our Ourisman and Roccaforte cases, as well as those presented in Moncrief v. United States,730 F. 2d 276 (5th Cir. 1984). Finally, the business purpose and activities of Bethinol greatly exceeded carrying on the normal duties of an agent. The record herein fully supports the conclusion that Bethinol was formed for the purpose of acting as the principal in the liquor store operations and actually did so. Petitioner was fully aware of the scope of Bethinol's activities and knew how the corporation was being represented to third parties and treated by the accountants *444 in preparing the various financial statements. Petitioner's own educational level and his experience as a bank director lead us to reject any suggestion that petitioner was unable to understand such financial statements when he reviewed them. Moreover, petitioner's personal accountant also reviewed Bethinol's financial statements. In light of the foregoing, it is abundantly clear that Bethinol was not merely a corporate agent of petitioner. Thus, since Bethinol was a separate taxable entity and not petitioner's corporate agent, only Bethinol could deduct the expenses and operating losses produced by the four liquor stores in the years at issue herein, not petitioner.Alternatively, petitioner claimed that he continued to operate the Bellas Hess and Winrock stores in his individual capacity following incorporation of Bethinol. The facts show otherwise.Having concluded that Bethinol in fact operated all four liquor stores as the principal thereof, we need not address the parties' arguments regarding any allocation of expenses among the four stores so as to ascertain which expenses were incurred with respect to the Bellas Hess and Winrock stores.
Petitioner next asserts that even *445 if Bethinol was a separate taxable entity and was not merely his agent, he is still entitled under section 162 to deduct the expenditures he made in Bethinol's behalf in 1972. Section 162(a) provides, in pertinent part, that: In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *. The general rule is that a shareholder [15] may not deduct a payment made on behalf of the corporation but rather must treat it as a capital expenditure. Deputy v. DuPont,308 U.S. 488 (1940); Gould v. Commissioner,64 T.C. 132, 134 (1975); Rand v. Commissioner,35 T.C. 956 (1961). The trade or business of a corporation is not the trade or business of its shareholders. Whipple v. Commissioner,373 U.S. 193 (1963). However, the payment on behalf of the corporation may be deducted if such payment is an ordinary and necessary expense of a trade or business of the shareholder. *446 Lohrke v. Commissioner,48 T.C. 679 (1967). Prior cases of this Court have recognized that where the expenditures sought to be deducted were made by a taxpayer to protect or promote his own ongoing business, such expenditures are ordinary and necessary within the meaning of section 162(a) and may be deducted by the taxpayer, even though the transaction giving rise to the expenditure(s) originated with another person. Lohrke v. Commissioner,supra at 684-685; Pepper v. Commissioner,36 T.C. 886 (1961). [16]
In Lohrke, after an exhaustive review of many of the cases dealing with this issue, we stated that: The tests as established by all of these cases are that we must first ascertain the purpose or motive which causes the taxpayer to pay the obligations of the other person. *447 Once we have identified that motive, we must then judge whether it is an ordinary and necessary expense of the individual's trade or business; that is, is it an appropriate expenditure for the furtherance or promotion of that trade or business? If so, the expense is deductible by the individual paying it. Lohrke v. Commissioner,supra,48 T.C. at 688. Rushing v. Commissioner,58 T.C. 996, 1003 (1972). Thus, in order to determine whether the disallowed expenditures are deductible by petitioner under section 162, we must (1) ascertain his purpose or motive in making the payments and (2) determine whether there is a sufficient nexus between the expenditures and petitioner's own trade or business. Lohrke v. Commissioner,supra. Petitioner bears the burden of proving respondent's determination was in error. Rule 142(a), Tax Court Rules of Practice and Procedure.
Although petitioner's stated reasons or motives for making the payments in question herein are numerous, we think his dominant motive was to provide operating capital and perpetuate or revitalize the liquor operations carried on by Bethinol. This conclusion is *448 amply supported by the fact that creditors of Bethinol refused to continue to deal with Bethinol on a credit basis until petitioner paid the overdue accounts and agreed personally to guarantee future debts of the corporation. Petitioner's expectation that he would be reimbursed by the corporation once it became a profitable venture provides further support for this conclusion. We think the payments were made to protect petitioner's investment in Bethinol's liquor store business, rather than to promote or protect his own trade or business as a medical doctor. As such, the expenditures on behalf of Bethinol are not deductible by petitioner. Gould v. Commissioner,supra; see Koree v. Commissioner,40 T.C. 961 (1963). Petitioner's claim that he made such payments to prevent injury to his personal credit reputation and thereby to his trade or business as a medical doctor is unpersuasive. Simply stated, petitioner has presented no evidence that persuades us that his own credit reputation or his medical practice, centered in California, would be adversely affected by failure to pay creditors of Bethinol, a corporation operating liquor stores located *449 in New Mexico. To the extent such a concern might have motivated petitioner, we think it was minimal at best. Even assuming, for the sake of argument, that the dominant motive or reason underlying petitioner's payment of these expenses on behalf of Bethinol was a personal belief that such action was necessary to preserve his credit reputation and protect his medical practice, we would be unable to conclude that a sufficient nexus existed between such expenditures and petitioner's trade or business. We fail to see how nonpayment of Bethinol's creditors, largely wholesale liquor dealers located in New Mexico, could have any appreciable effect on petitioner's trade or business as a medical doctor, specializing in obstetrics and practicing in California. We cannot find that such payments were ordinary and necessary expenses of petitioner's medical practice. Petitioner also asserts his understanding that he was personally liable for these expenses under New Mexico law as the record owner of New Mexico liquor license No. 327 (Bellas Hess); that this understanding was a motivating factor behind payment of the expenses in question; and that since he was personally liable for such debts, *450 he was entitled to a deduction upon payment thereof. However, this argument is without factual basis or legal merit. Even assuming petitioner was personally liable under New Mexico law, a point on which we remain unconvinced but need not decide, such fact does not in and of itself entitle petitioner to deduct his payment of these expenses. See Ihrig v. Commissioner,26 T.C. 73, 76 (1956), and cases cited therein. Section 162(a) requires that such expenses be paid or incurred in carrying on a trade or business ofthetaxpayer before such expenditures become deductible. Operation of the liquor stores was part of Bethinol's trade or business, not petitioner's. For all of the above reasons, petitioner has failed to show that he falls within an exception to the general rule that one taxpayer may not deduct the expenses of another taxpayer. Thus, regardless of whether petitioner was or was not personally liable under New Mexico law, he is not entitled to a deduction under section 162 for his payment of these expenses. As another argument in support of the claimed deductions, petitioner asserts that payment of the expenses was necessary to protect his *451 record ownership of New Mexico liquor license No. 327 (Bellas Hess) and his leasehold interest in liquor license No. 96 (Winrock). Petitioner asserts that in the event of nonpayment, Bethinol's creditors could have obtained a lien against such licenses and foreclosed thereon to recover amounts owed to them by Bethinol. Petitioner also points out that license No. 327 had been pledged as security in connection with the operation of the Pizza Hut liquor store. From the above, petitioner seems to claim his payment of the expenditures in issue constituted "… ordinary and necessary expenses paid or incurred… for the management, conservation, or maintenance of property held for the production of income…" and are therefore deductible under section 212(2). As a factual matter, we are satisfied that while license No. 327 and the leasehold interest in license No. 96 were never formally transferred to Bethinol, they had been transferred for all practical purposes and constituted part of Bethinol's corporate assets and part of petitioner's contribution to the capital of his corporation. We think that as to petitioner, any expenditures in regard to the liquor licenses at best would have *452 been capital expenditures to perfect or defend title to property and not ordinary and necessary expense of any profit-seeking activity of petitioner. Petitioner nonetheless argues that the amounts paid to claimants in settlement of pending or threatened lawsuits against petitioner and Bethinol in 1972 are deductible by him under United States v. Gilmore,372 U.S. 39 (1963) and Bradford v. Commissioner,70 T.C. 584 (1978). However, his reliance upon the "origin and character" of the claim theory of those cases is unavailing. In Gilmore, the Supreme Court explained the origin-of-the-claim principle developed in earlier cases as follows: The principle we derive from these cases is that the characterization, as "business" or "personal", of the litigation costs of resisting a claim depends on whether or not the claim arises in connection with the taxpayer's profit-seeking activities.It does not depend on the consequences that might result to a taxpayer's income-producing property from a failure to defeat the claim, for, as Lykes teaches, that "would carry us too far" and would not be compatible with the basic lines of expense deductibility *453 drawn by Congress. * * * [United States v. Gilmore,372 U.S. 39, 48 (1963), emphasis in original.] [Footnote reference omitted.] Thus, a deduction is allowable under section 212(2) only if the claim arose in connection with the taxpayer's profit-seeking activities.The claim underlying the expenditures in issue here arose out of the operation of the liquor stores which were operated by Bethinol, not by petitioner. Thus, the claim underlying these expenditures arose in connection with Bethinol's profit-seeking activities, not petitioner's. Therefore, for the same reasons present with respect to section 162, petitioner's payments of these claims were not "ordinary and necessary," and petitioner is not entitled to deduct such payments under section 212(2). Having concluded petitioner is not entitled to deduct the losses or expenditures under any of the theories detailed above, we note that we do not now decide whether petitioner would be entitled to any bad debt deductions under section 166. While we are satisfied that the major portion, if not all, of the amounts expended by petitioner on Bethinol's behalf constituted contributions to capital, the possibility *454 still exists that some of those advances may have given rise to a bona fide debtor-creditor relationship between petitioner and Bethinol. Further, although petitioner has offered no supporting evidence on this point, the possibility also exists that some of the payments may have been made in petitioner's role as a guarantor, thereby also possibly giving rise to a bona fide debtor-creditor relationship. See Putnam v. Commissioner,352 U.S. 82 (1956). In any event, it is clear from petitioner's own testimony that any such debts had not become worthless by the end of 1972, the last taxable year now before the Court. Petitioner looked to the corporation for repayment and at the end of 1972 petitioner still hoped that the corporation would become profitable. Thus, petitioner is not entitled to a bad debt deduction under section 166 in any of the years before us. Because of our disposition of this issue, we need not resolve the debt versus equity issues or determine whether any debt that may have arisen constitutes a business or nonbusiness debt. See section 166. The final issue for decision is whether petitioners are liable for the addition to tax for negligence *455 within the meaning of section 6653(a). Petitioners have the burden of proving respondent's determination to be erroneous. Ma-Tran Corp. v. Commissioner,70 T.C. 158, 172-173 (1978); Enoch v. Commissioner,57 T.C. 781, 802 (1972); Rule 142(a), Tax Court Rules of Practice and Procedure. They have not carried their burden.
Petitioners contend that since they relied upon a purported expert to prepare their returns, they cannot be liable for the addition to tax for negligence. It is true that we have sometimes refused to impose the negligence addition in situations where a taxpayer reasonably relied upon an expert in the preparation of the return. Industrial Valley Bank & Trust Co. v. Commissioner,66 T.C. 272, 283 (1976); Hill v. Commissioner,63 T.C. 225, 252 (1974), affd. in an unpublished opinion 551 F. 2d 313 (9th Cir. 1977). However, we do not think this exception properly applies in this case. Here petitioners simply signed the returns without ever examining them, when even the most cursory examination would have revealed the treatment of the losses and expenses at issue herein. On their 1970 *456 return, the claimed loss was improperly labelled as a loss from a joint venture purporting to include Winrock Liquors, Bellas Hess Liquors, and Charlie's Liquors. On their 1972 return, the claimed loss was improperly labelled as a loss from a partnership, Bethinol Enterprises. For the same years, petitioner J. R. Betson signed the Bethinol corporate returns on which the same operating losses were claimed. The basic issue in this case is who is entitled to the deduction, petitioner or Bethinol.
The duty to file accurate tax returns cannot be avoided by abdicating one's responsibility to an agent. Pritchett v. Commissioner,63 T.C. 149 174 (1974); Enoch v. Commissioner,supra;Soares v. Commissioner,50 T.C. 909 (1968); American Properties, Inc. v. Commissioner,28 T.C. 1100 (1957), affd. 262 F. 2d 150 (9th Cir. 1958); Bailey v. Commissioner,21 T.C. 678 (1954). Petitioners cannot avoid the negligence addition by simply asserting that an "expert" prepared their returns. That is particularly true where petitioners used two different return prepares, one for the personal returns *457 and one for the corporate returns, and where they failed to examine the returns so prepared. Here even the most cursory examination should have alerted petitioner J. R. Betson to the errors and inconsistencies in the returns. Imposition of the negligence addition will be sustained. To reflect the foregoing and the concessions by the parties, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. At that time New Mexico had what was described as a "canopy" liquor license. Under this system, two or more businesses located under the same roof could operate under one liquor license. In this case, liquor license No. 96 was owned by Winrock Enterprises, Inc., but under the "canopy" system, petitioner and Diamond Jim's leased the right to operate under the license.↩
3. On September 27, 1969, petitioner also entered into a sublease with Mr. Charles Elias for the package liquor store portion of certain premises located at 8224 Menaul Avenue, Albuquerque, New Mexico, and the use of liquor license No. 919. The term of the sublease was one year, ending September 30, 1970. This store was commonly known as Charlie's Liquors. On petitioner's 1970 Federal income tax return, he claimed a loss in the amount of $16,616.36 from a joint venture purporting to include Winrock Liquors, Bellas Hess Liquors, and Charlie's Liquors. That loss was disallowed by respondent and is part of the loss involved in this case. However, Charlie's Liquors apparently is not one of the four liquor stores involved in the present case.↩
4. Under New Mexico's "canopy" system, the term "agent-lessee" normally referred to the absentee-owner of the canopy interest in the liquor license. The person or entity who was actually present and operating the liquor license was designated as the "agent-manager." For the years in issue, petitioner was the official agent-lessee of liquor license No. 96, and Bill Baldwin was the agent-manager. Bill Baldwin was an employee of Bethinol during the periods in issue.↩
5. Bethinol also had an account with the Bank Americard Division of the First National Bank in Albuquerque.↩
6. On July 3, 1972, Mr. Branch wrote to an official of the Department of Alcoholic Beverage Control stating that his firm had "been retained to represent J. R. Betson d/b/a Bellas Hess Liquors" in regard to the violation. That same day another member of Mr. Branch's firm wrote to another official of the Department of Alcoholic Beverage Control concerning the liquor license of "Western Wine and Liquor Marts, a division of Bethinol Corporation, being operated at the Bellas-Hess Store" and confirming that the store could operate pending formal receipt of the renewal license that apparently had been approved. The Court can only conclude that petitioner was identified as operating the store on occasion when it served his purpose to be doing so but otherwise the corporation was identified as the operator of the store.↩
7. Mr. John Leventis, who did not appear at the trial, performed petitioner's personal accounting services and prepared his personal tax returns. However, KMC regularly furnished Mr. Leventis with copies of all corporate financial statements and other accounting materials prepared for Bethinol.↩
8. The $62,292 paid in settlement of the three lawsuits discussed above arose out of liquor purchases prior to execution of these guarantee agreements.↩
9. Petitioner testified that there was so much litigation going on at the time that he was not sure which of these other payments were in settlement of litigation and which were just payments of delinquent credit accounts.↩
10. Petitioner usually personally guaranteed these loans and felt personally obligated to repay them. However, petitioner realized his obligation to do so was secondary to that of Bethinol.↩
11. Petitioner was told by Mr. Leventis, his personal accountant, not to make such notations on any of the checks. However, the Court is satisfied that such amounts were either loans to the corporation or contributions to capital.↩
12. Petitioner testified that the returns were always presented to him and his wife about 11:30 p.m. on the last night before they were due, but the Court found this testimony unworthy of belief, particularly since Mr. Leventis was not present at the trial to refute this highly improbable scenario.↩
13. Article IV provided that "The corporation shall not commence business until at least One Thousand Dollars ($1,000.00) has been received by it as consideration for the issuance of shares."↩
14. See also F.R. Johnson Products Co. v. Commissioner,T.C. Memo. 1982-110; McDonnell v. Commissioner,T.C. Memo. 1965-125↩.
15. Although petitioner may not have been technically a "shareholder" of Bethinol in that no stock was ever issued, it is clear that petitioner owned substantially all, if not all, of the equity interests in Bethinol. ↩
16. See also Jenkins v. Commissioner,T.C. Memo. 1983-667↩.